COUNCIL OF the DISTRICT OF COLUMBIA, Appellant,

v.

Rachel L. CLAY, Appellee.

No. 95–CV–1062.

District of Columbia Court of Appeals.

Argued June 24, 1996.

Decided Oct. 31, 1996.

---

Edward E. Schwab, Assistant Corporation Counsel, with whom Charles F.C. Ruff, Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for appellant.

Bruce Comly French, for appellee.

Before WAGNER, Chief Judge, and SCHWELB and REID, Associate Judges.

SCHWELB, Associate Judge:

■ The principal question in this case is whether appellee Rachel L. Clay, who was the Director of the Legislative Services Division of the Council of the District of Columbia, a DS–13 position,[1] until her termination in 1990, was a member of the Career Service who could be discharged only for cause. We hold that she was not.

1. The grades of District of Columbia employees are preceded by the abbreviation DS. The corresponding abbreviation for federal employees is GS.

2. Ms. Clay contends in this court, *inter alia*, that she was protected from termination without cause even if she was in the Excepted Service. The OEA's decision in Ms. Clay's favor was not based on that ground. We have held that "this court can only affirm an administrative agency's decision for the reasons given by the administrative agency." *District of Columbia Metro. Police Dep't v. Perry*, 638 A.2d 1138, 1146 n. 23 (D.C. 1994) (citations omitted). We therefore leave to the OEA's consideration on remand those of Ms.

I.

## PRIOR PROCEEDINGS

The District of Columbia appeals from an order of the Superior Court which affirmed a decision of the Office of Employee Appeals (OEA) adverse to the District. The challenged OEA decision ordered Ms. Clay's reinstatement to her former position on the ground that she had been unlawfully terminated without cause. The case, as we see it, turns on whether Ms. Clay was in the Excepted Service, from which termination without cause is permitted, or in the Career Service, from which such termination is proscribed.[2]

Ms. Clay began her career with the Council on March 19, 1972 as an Administrative Aide (GS–7).[3] During the years that followed, she received several promotions and grade increases. All of the "Form 1" personnel action forms appointing her to a new position expressly stated that the position was in the Excepted Service. The "remarks" section of each personnel action form contained the following statement:

As a member of the D.C. Council Staff, Appointee serves at the will of the appointing authority and this appointment is subject to termination at the pleasure of the Council.

Ms. Clay received her final grade increase on January 29, 1978. On that date, she was promoted from Legislative Services Special-

Clay's contentions which the OEA did not address in its final decision of June 18, 1993. The OEA must also determine whether any such contentions were raised in timely fashion and adequately preserved.

3. Ms. Clay worked in a number of government positions before joining the Council. In January 1964, she was hired as a clerk typist (GS–3) for the Department of Public Welfare (DPW). While at the DPW, Ms. Clay was promoted several times, and in September 1969, her status was converted to "Career Tenure," retroactive to January 20, 1967. Ms. Clay was transferred in October 1969 to the position of Administrative Aide in the Office of Personnel (GS–6).

ist (GS–11) to the position of Director of Legislative Services. Ms. Clay's formal job title in her new position remained Legislative Services Specialist, but her new grade was GS–13. On April 5, 1984, Ms. Clay's title was changed to Supervisory Legislative Services Specialist (DS–13), but her duties remained the same. Once again, the Form 1 for Ms. Clay's new position reiterated that her employment could be terminated at the pleasure of the Council.

On May 3, 1984, Ms. Clay filed a grievance under the Council's adverse action and grievance procedures, which are published at 29 D.C.Reg. 874 (1982). She asserted that the April 5, 1984 Form 1 improperly effected a change in her status from the Career Service to the Excepted Service. She argued that she had become a member of the Career Service on January 2, 1980, the effective date of the Comprehensive Merit Personnel Act (CMPA), D.C.Code §§ 1–601 *et seq.* (1992).[4] She relied on D.C.Code § 1–602.4(c), which provides, in pertinent part, as follows:

> On January 1, 1980, all persons employed by the District of Columbia government, including those persons employed by the District of Columbia government on the date that this chapter becomes effective as provided in § 1–637.1, shall automatically transfer into the appropriate personnel system as established pursuant to subchapters VIII [Career Service] and IX [Educational Service] of this chapter or § 1–610.4 [special appointments] or 1–610.9 [attorneys]. The classification of and compensation for the position assumed upon transfer, and the rights and benefits inhering in such position, shall be at least equal to the classification, compensation, rights and benefits associated with the position from which said employee is transferred. The rights and benefits protected under this subsection shall be only those applicable to said employees under the provisions of personnel laws and rules and regulations in force on December 31, 1979: Provided, however, that no employee covered under the provisions of this subsection shall be reduced in pay except as provided in subchapter XXV of this chapter.

Ms. Clay argued that all excepted District employees who were not educational service employees, special appointees, or attorneys automatically became career employees on January 1, 1980.

On January 9, 1987, after protracted proceedings, the Chairman of the Council, David A. Clarke, issued a final decision denying Ms. Clay's grievance.[5] The Chairman concluded that Ms. Clay's position had been correctly classified as falling within the Excepted Service. The Chairman relied, in substantial part, on two sections of the CMPA which he viewed as relevant to Ms. Clay's grievance. The first of these provisions, D.C.Code § 1–610.3(a)(3), reads as follows:

> (a) Under qualifications issued pursuant to § 1–610.1, each appropriate personnel authority may appoint persons to the Excepted Service as follows:
>
> (3) *All employees of the Council of the District of Columbia, except those permanent technical and clerical employees* appointed by the Secretary or General Counsel....

(Emphasis added). The second statute cited by Mr. Clarke, D.C.Code § 1–610.7, provides, in pertinent part:

> Persons holding appointments in the District of Columbia government, paid from

---

4. Unless otherwise stated, all references in this opinion to the District of Columbia Code are to the 1992 replacement edition.

5. The Council had previously appointed a hearing examiner to consider the case and to advise the Chairman. On July 3, 1986, in a non-binding recommendation to the Chairman, the hearing examiner concluded that Ms. Clay's position was in the Excepted Service. The examiner recommended, however, that an exception be made for Ms. Clay and that a new Form 1 be issued which would award her "Career Status—Incumbent Only." Chairman Clarke described the recommendation that Ms. Clay be reclassified as "very inviting," but he concluded that he had "no right or authority" to adopt it, because "an elected official's designation of a person as career-service when that person is really in an excepted-service position, based on the appointing official's appreciation of his [or] her work, would fly in the face of what the excepted service is all about."

appropriations made to the Council of the District of Columbia *and classified as a GS–10 or less* under § 5332 of Title 5 of the United States Code and whose position would not be in the Excepted Service under the provisions of this subchapter on January 1, 1980, *shall be appointed to the Career Service* created in subchapter VIII of this chapter, if such incumbent is found to possess the minimal qualifications for the position to which he or she is appointed.

(Emphasis added). The Chairman construed these provisions to mean that employees who were GS–11 and above (including Ms. Clay) remained in the Excepted Service following the effective date of the CMPA.[6]

On January 27, 1987, Ms. Clay appealed to the OEA from Chairman Clarke's decision. On November 26, 1990, while her OEA appeal was pending, Ms. Clay received a notice of separation effective December 31, 1990. She was advised that she was being terminated "as a result of the change within the Council of its elected Chairman." On January 14, 1991, Ms. Clay moved to amend her petition to the OEA to include a challenge to the authority of the Council to discharge her without cause. The OEA granted Ms. Clay's motion, and the legality of her termination is therefore properly before us.

On July 9, 1992, an OEA Administrative Judge issued an "initial decision" in favor of Ms. Clay. He concluded that, on January 1, 1980, Ms. Clay was automatically transferred from the Excepted Service to the Career Service by virtue of D.C.Code Section 1–602.4(c). The Administrative Judge found that Ms. Clay had occupied several "Excepted" positions under the federal classification system, but nevertheless concluded that

> the CMPA created a personnel system for D.C. Government employees separate and distinct from the federal civil service system of which the District had been a part. Therefore, by operation of law, on January 1, 1980 all employees of the D.C. government automatically transferred into either the Career Service, the Educational Service, or those positions established pursuant to [Sections] 1–610.4 and 1–610.9. *See* D.C.Code Ann. § 1–602.4(c) (1987). This automatic transfer is further evidenced by the provisions of D.C.Code Ann. § 1–608.1(a) (1987) and DCOP Rule § 201.1.
>
> In the instant matter, it is clear that Employee did not transfer into the Educational Service or into any of the "Special Appointments" set forth in [Section] 1–610.4 of the CODE [sic]. Further, since Employee is not an attorney, she did not transfer pursuant to [Section] 1–610.9 of the Code. Thus, I conclude that on January 1, 1980, Employee automatically became a member of the Career Service.

On June 18, 1993, the OEA issued a final decision denying the Council's petition for review. The OEA, agreeing in large measure with the Administrative Judge, accepted Ms. Clay's interpretation of Section 1–602.4(c). The OEA also held that the other provisions of the CMPA on which Chairman Clarke had relied—Sections 1–610.7 and 610.3(a)(3)—did not conclusively support the Council's position.

---

**6.** In his decision, the Chairman described Ms. Clay's duties in considerable detail. He found that Ms. Clay

> exercis[ed] a wide range of judgment in planning and conducting the work of the unit. She develop[ed] systems and establish[ed] policies and procedures to track, control, and process the flow of legislative measures before the D.C. Council.... This [work] includ[ed], but [was] not limited to, developing, implementing, evaluating and adjusting policies and procedures for the efficient and effective identification, retrieval, publication, and transmittal of a wide range of legislative information.... [Ms. Clay] was delegated wide latitude for the exer-

cise of independent judgment in resolving internal administrative problems and legislative inquiries referred to the Council.... She assisted the Secretary in rendering advice to Council Members and staff regarding the adequate documentation and publication of Council business.... [Ms. Clay also] represented the Council and [the] Secretary in negotiations and administration of contracts. She provided advice in areas of planning.... [and] was confronted with substantial planning problems.

(Internal quotation marks omitted). The Chairman therefore concluded that Ms. Clay's duties were "far more than 'clerical and technical.'"

On June 23, 1995, a judge of the Superior Court upheld the OEA's decision in a brief order which reads, in pertinent part, as follows:

> While the court finds that the relevant provisions of the Comprehensive Merit Personnel Act, including D.C.Code §§ 1–602.4(a), 1–610.3, and 1–610.7, are not models of clarity, the court cannot conclude that the Office of Employee Appeals' Opinion and Order of June 18, 1993 was 'clearly erroneous as a matter of law.' *See* Super. Ct. Agency Review Rule 1(g) (1995).

The Council filed a timely appeal.

## II.

## LEGAL DISCUSSION

*A.   The Standard of Review.*

■   The facts in this case are undisputed, and the question before us is one of law.[7]  As we recently reiterated in *Harris v. Office of Worker's Compensation*, 660 A.2d 404 (D.C. 1995),

> [o]ur review of the agency's legal rulings is *de novo,* for "[i]t is emphatically the province and duty of the judicial department to say what the law is," *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803), and the judiciary is the final authority on issues of statutory construction. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 2782 n. 9, 81 L.Ed.2d 694 (1984).

*Id.* at 407.  We accord considerable weight to the interpretation of a statute by the agency responsible for administering it, *id.* (citations omitted), but such deference is appropriate only "as long as that interpretation is reasonable and not plainly wrong or inconsistent with [the] legislative purpose." *Coumaris v. District of Columbia Alcoholic Beverage Control Bd.,* 660 A.2d 896, 899 (D.C.1995) (citations omitted); *see generally Chevron, supra,* 467 U.S. at 842–45, 104 S.Ct. at 2781–83.  We have also generally declined to defer to the administrative construction of a statute where the agency has failed to construe the ambiguous terms of that statute or to identify the question of construction being addressed.  *Cf. Coumaris, supra,* 660 A.2d at 899; *see also Zenian v. District of Columbia Office of Employee Appeals,* 598 A.2d 1161, 1166 (D.C.1991).[8]

*B.   The Language of Section 1–602.4(c).*

The OEA's disposition of this case in Ms. Clay's favor was predicated on the proposition that, as of January 1, 1980, Ms. Clay was automatically transferred into the Career Service by operation of the CMPA. Specifically, the OEA relied on Section 1.602.4(c), which we have quoted above at pp. 3–4, *supra.*  The third sentence of that section, however, reads, in pertinent part, as follows:

> The rights and benefits protected under this subsection shall be *only those applicable to said employees under the provisions of personnel laws and rules and regulations in force on December 31, 1979 . . . .*

(Emphasis added).  The foregoing sentence was unaccountably omitted from the OEA's statutory analysis.  Indeed, the OEA quoted only the portion of the section which pre-

---

7.  An appellate court, of course, reviews the trial court's legal conclusions "under the non-deferential *de novo* standard." *See, e.g., Griffin v. United States,* 618 A.2d 114, 117 (D.C.1992) (citations omitted).

8.  "The deference which courts owe to agency interpretations of statutes which they administer is, of course, at its zenith where the administrative construction has been consistent and of long standing, and plummets substantially when these attributes are lacking." *Tenants of 738 Longfellow St., N.W. v. District of Columbia Rental Hous. Comm'n,* 575 A.2d 1205, 1213 (D.C.1990) (cita-

tions omitted).  The OEA's construction of the CMPA in this case is not of long standing, and the OEA cited none of its own precedents in support of the decision.

The Council also contends that the court should accord Chairman Clarke's decision some weight in construing the CMPA, notwithstanding the Council's status as a party to this litigation. Because we disagree with OEA's construction in any event, we need not decide whether the fact that the Chairman's statutory analysis differs from the OEA's should affect our standard of review.

cedes this sentence.[9] The OEA thus analyzed the provision under consideration without giving any consideration to the language therein which deals most directly with the issue at hand.

Ms. Clay acknowledged before the OEA that, as of December 31, 1979, her GS-13 position was not in the federal Career Service. Because Section 1–602.4(c), by its terms, conferred on her only those protections to which she was entitled prior to January 1, 1980, and because Ms. Clay did not enjoy, in 1979, the right not to be terminated without cause, it follows that the enactment of Section 1–602.4(c) did not invest her with such a right. Indeed, if the second and third sentences of the section are read together, then the only reasonable import of the entire provision is that the transferred employee receives all of the rights and benefits that he or she enjoyed in the federal service or in the pre-CMPA Career Service, but no additional rights or benefits.

### C. Expressio Unius Est Exclusio Alterius.

Disregarding the critical third sentence of Section 1–602.4(c), the OEA focused instead on the earlier language in that section, which provides that all District employees shall "automatically transfer into the appropriate personnel system...." The OEA noted that Section 1–602.4(c) identifies three categories into which different employees would transfer:

1. the Career Service;
2. the Educational Service; and
3. the Excepted Service, in relation to which the statute mentions only attorneys or special appointees.

Ms. Clay had no connection with the Educational Service and was neither an attorney nor a special appointee. Accordingly, in the OEA's view, the Council must necessarily have intended that she transfer into the Career Service. The Career Service, in other words, was viewed by the OEA as a catch-all category for anyone who did not fit into any other Service.

In support of this conclusion, the OEA invoked the venerable Latin maxim *"expressio unius est exclusio alterius,"* which means, in this context, that "when a legislature makes express mention of one thing, the exclusion of others is implied." *See, e.g., McCray v. McGee,* 504 A.2d 1128, 1130 (D.C. 1986) (citation omitted). The OEA reasoned that, because the statute expressly provided that attorneys and special appointees were automatically transferred into the Excepted Service, other employees necessarily were not.

Latin maxims, however, will only take us so far. *See Edwards v. United States,* 583 A.2d 661, 664 (D.C.1990). The *expressio unius* maxim, in particular, must be applied with a considerable measure of caution. *Cf. National Petroleum Refiners Ass'n v. FTC,* 157 U.S.App. D.C. 83, 87, 482 F.2d 672, 676 (1973), *cert. denied,* 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1974). It is "an aid to construction, not a rule of law." *Neuberger v. C.I.R.,* 311 U.S. 83, 88, 61 S.Ct. 97, 101, 85 L.Ed. 58 (1940). It must therefore be subordinated to "clear and contrary evidence of [legislative] intent." *Id.; see also In re Joseph B.,* 34 Cal.3d 952, 196 Cal.Rptr. 348, 351, 671 P.2d 852, 855 (1983).

An argument predicated on *expressio unius* might perhaps be persuasive here if Section 1–602.4(c) did not contain the critical third sentence, which explicitly and unambiguously provides that the CMPA confers on an employee only those protections which he or she enjoyed before the CMPA's effective date. The inclusion of that sentence in the statute, however, makes it unreasonable to infer, on the basis of a permissive Latin maxim, that the Council intended, in enacting the CMPA, to require the automatic transfer

---

**9.** The Administrative Judge likewise failed to address the third sentence of Section 1–602.4(c). Similarly, counsel for Ms. Clay has not discussed it in any of his briefs. Indeed, Chairman Clarke noted in his decision, which was issued in 1987, that Ms. Clay's counsel, in quoting Section 1–602.4(c), had "inadvertently I am sure" omitted four key italicized words: *"only those [* rights and benefits*] applicable to."* Unfortunately, counsel left the same four words out of his brief to this court, filed on April 5, 1996. At oral argument, counsel effectively conceded that the language of the third sentence was contrary to his position, and he was understandably unable to offer an interpretation of the sentence that was not damaging to his cause.

of high-ranking and policy-making employees into the Career Service. The observations of Chairman Clarke in his written decision denying Ms. Clay's grievance are persuasive in this regard:

> [Ms. Clay] argues that [Section] 1–602.4 provides that all persons employed by the District of Columbia government on January 1, 1980, whether within the excepted service at that time or not, transferred to the career service. Such a reading would mean that any Council employee, in whatever office, who was employed anywhere in the District government on January 1, 1980, would be forever within the career service. Indeed, under this interpretation, any Councilmember's personal staffer who was on board on January 1, 1980 could claim career status and remain with that Councilmember or his [or] her successor against the member's will. I am positive that this was not the intent of the law.

### D. Other Relevant CMPA Provisions.

Even if we were to assume, *arguendo*, that the third sentence of Section 1–602.4(c) does not require the rejection of Ms. Clay's claim, that section nevertheless must be viewed not in isolation, but together with other relevant provisions of the CMPA. *See, e.g., District of Columbia v. Morrissey*, 668 A.2d 792, 797 (D.C.1995) (citations omitted). Our consideration of those sections of the Act which deal with the problem at hand, and which were relied upon by Chairman Clarke, reinforces

our disagreement with the OEA's disposition of the case.

Section 1–610.3(a)(3) provides that the appropriate personnel authority[10] may appoint to the Excepted Service "[a]ll employees of the Council of the District of Columbia, except those permanent technical and clerical employees appointed by the Secretary or General Counsel." Ms. Clay's position was more than that of a technical or clerical employee. On the contrary, she held important policy-making responsibilities. See note 6, *supra*. Section 1–610.3(a)(3) thus contemplates that Ms. Clay and others in similar positions would be in the Excepted Service and not in the Career Service. Moreover, the regulations implementing the CMPA provide that all Council employees, except those who are in grade DS–10 or less and whose functions do not include "advocacy or policy," shall be in the Excepted Service.[11] Ms. Clay was not a lower grade technical or clerical employee and does not fall within the exception for such employees which is recognized in the cited regulations.[12]

Section 1.610.7, quoted at page 5, *supra*, is also difficult to reconcile with Ms. Clay's position. That provision automatically transferred to the Career Service only those otherwise qualified District of Columbia employees who were "*classified as a GS–10 or less*" under the federal classification system. If Section 1–602.4(c) had been intended to move into the Career Service government

---

10. In this case, the appropriate personnel authority is the Chairman of the Council. *See* D.C.Code § 1–604.6(b)(3).

11. Section 904.9 of the D.C. Office of Personnel Regulations, 32 D.C.Reg. 2275 (1985), provides that "[p]ursuant to D.C.Code § 1–610.3(a), policy positions shall consist of . . .

> (c) Positions occupied by all employees of the Council of the District of Columbia, except those permanent technical and clerical employees appointed by the Secretary or General Counsel. . . ."

Section 904.10 provides:
> For the purposes of § 904.9(c), in accordance with D.C.Code § 1–610.7 (1981), permanent technical and clerical employees shall

mean personnel at a DS–10 grade or less whose responsibilities and duties require training or experience but whose functions do not include advocacy or policy.

Both of these quoted provisions are included in Part 9 of the regulations which deal with the Excepted Service.

12. According to the OEA, the Council's reliance on Section 1–610.3(a)(3) is unavailing because "there is no indication that the personnel authority for the Council ever appointed Employee to an Excepted Service position pursuant to [Section] 1–610.3(a)(3)." In light of our construction of Section 1–602.4(c), however, Ms Clay was automatically transferred into the Excepted Service, and no such "appointment" was necessary.

employees who, like Ms. Clay, held grades of GS–11 or above, then the language in Section 1–610.7, italicized above, would serve no purpose and would have no effect. We must be "especially mindful," in interpreting the CMPA as a whole, that "each provision of the statute should be construed so as to give effect to all of the statute's provisions, not rendering any provision superfluous." *Morrissey, supra,* 668 A.2d at 798 (quoting *Thomas v. District of Columbia Dep't of Employment Servs.,* 547 A.2d 1034, 1037 (D.C.1988)). Moreover, canons of construction aside, it surely defies common sense to suggest that if the Council intended to ensure the automatic transfer to the Career Service of otherwise eligible employees regardless of grade, it would have written into the statute a transfer provision limited to those employees who were classified at GS–10 or less.[13]

**13.** According to the OEA, the Council "could have enacted [Section] 1–610.7 (which transfers into the Career Service those employees graded GS–10 and below) as a limitation on the appointment authority conferred in [Section] 1–610.3(a)(3)." We conclude that this reading of Section 1–610.7 is a strained one to say the least. Nothing in the statute or the regulations identifies Section 610.7 as effecting a restriction on the power of the "appropriate personnel authority" to designate employees to the Excepted Service, and the appointing authority is not placed on notice of any such purposed restriction. Indeed, Section 1–610.3(a) authorizes the appointing authority to make appointments "under qualifications issued pursuant to [Section] 1–610.1," but makes no reference at all to Section 610.7.

**14.** Ms. Clay relies on Section 1–610.2, denominated "Nature of positions in the Excepted Service and conversion rights." We agree with the following discussion of that section in Chairman Clarke's written decision:

> Petitioner also refers to [Section] 1–610.2 which describes the intent of the excepted service as applying to persons whose jobs are "of a policy determining, confidential, or policy advocacy character and who report directly to the head of an agency." It is clear from her position descriptions that her responsibilities include matters of policy. And, while it is correct that she reports to the Secretary of the Council and not to the Chairman, I view [Section] 1–610.2. If such were not the case, then

### E. The Statute as a Whole.

Considered in isolation, each of the three sections of the CMPA which we have discussed above might conceivably be viewed as inconclusive with respect to Ms. Clay's status. Read together, however, they establish to our satisfaction that she was properly placed in the Excepted Service. Notwithstanding its somewhat perplexing focus on attorneys and special appointees, Section 1–602.4(c) was intended to confer on transferred employees only those benefits and protections which they had enjoyed as federal or pre-CMPA employees. Sections 1–610.3(a)(3) and 1–610.7, as well as the implementing regulations, persuade us that GS–13 employees of the Council holding policy-making positions were never intended to become members of the Career Service.[14]

> employees within the office of each member of the Council and within each committee would be exempted from the excepted service because they do not report to the Chairman, and such would be clearly beyond the intent of the legislation.

Ms. Clay also cites Section 201.1 of the D.C. Office of Personnel Regulations, 27 D.C.Reg. 4343 (Oct. 3, 1980), which provides:

> Except as provided below, all D.C. Government employees serving in excepted or competitive service positions are transferred into the Career Service, established in Title VIII of the Law.

None of the provisions "below" fits Ms. Clay's circumstances. Accordingly, if this regulation is read literally, then it appears to vindicate Ms. Clay's contention that she was transferred into the Career Service. If Section 201.1 is so construed, however, it runs directly afoul of the third sentence of Section 1–602.4(c), for it purports to accord to transferred employees protections dramatically beyond those which they enjoyed in the federal service or in the pre-CMPA Career Service. A regulation out of harmony with the underlying statute is a "mere nullity." *Tenants of 738 Longfellow St., supra,* 575 A.2d at 1213 (citations omitted). In any event, Section 904.9 of the Regulations, which is quoted at note 10, *supra,* and which deals specifically with Council employees, is irreconcilable with the notion that these employees as a group were automatically incorporated into the Career Service without regard to their duties or grade level.

**III.**

**CONCLUSION**

For the foregoing reasons, the judgment appealed from is reversed. The case is re-

manded to the OEA[15] for further proceedings consistent with this opinion.[16]

*So ordered.*

---

15. We see no useful purpose in remanding first to the trial court so that that court may remand the case to the OEA.

16. Without specifically challenging the constitutionality of the CMPA, counsel for Ms. Clay asserts that it is "constitutionally suspect because it permits the Council to amend Congressional legislation without compliance with the Presentment and Bicameralism clause." This contention is without merit. *See* D.C.Code §§ 1-201(a), –204; *see also Christianson v. King County*, 239 U.S. 356, 365, 36 S.Ct. 114, 118, 60 L.Ed. 327 (1915); *Sprint Communications Co. v. Kelly*, 642 A.2d 106, 112 (D.C.), *cert. denied*, —— U.S. ——, 115 S.Ct. 294, 130 L.Ed.2d 208 (1994); *Gary v. United States*, 499 A.2d 815 (D.C.1985). Moreover, if the CMPA were unconstitutional, Ms. Clay would revert to her status at the time of its enactment, namely, Director of Legislative Services (GS–13). That position, as the OEA recognized, was in the Excepted Service.