The CHIEF JUSTICE
delivered the opinion of the court; in which the case is stated.
The schooner Jenny, with a cargo of one hundred and fifty-four bales of cotton, was captured by the United States war steamer Virginia, in Texan waters, north of the Eio *184 Grande, on the 6th of October, 1863, and was brought into New Orleans.
She was libelled as prize of war in the District Court for the Eastern District of Louisiana on the 16th of October.
On the 7th of November John Johnson, the master of the schooner, put in four separate claims: one in behalf of Hale & Co., for the schooner; one in behalf of H. Eernstein, for forty-four bales of cotton; one in behalf of Ruprecht & Fortner, for thirty-nine bales, and one in behalf of J. Rosenfeld, for seventy-one bales. On the 10th of December two other claims were filed: one by Charles Andre, in behalf of Augustine Stark, for the thirty-nine bales, and the other by 'Conrad Seiler, in behalf of R. M. Elkes, for the forty-four bales.' No personal claim or test-affidavit was made by any of the parties alleged .to have title in the vessel or cargo; and no evidence was put in of any authority in Andre or Seiler to represent Stark or Elkes. The authority of Johnson was derived from his character as master.
The seizure was made because she sailed from the blockaded coast of Texas, and because of the unsatisfactory nature of her papers.
Her manifest was dated September 17,1863, at which, time her log-book showed that she had only part of her cargo on board; it appeared also from her manifest, her bill of health from the American consul, and her Mexican clearance, that she was bound for New York, whereas the captain’s letter of instruction required her to stop at Nassau and conform to the instructions of Saunders & Co., of that place; both her bills ;of health specified six men, and no passengers, whereas, in fact, a passenger by the name of Mund was found on board; the provisional c'ertificate of registry represented Hale & Co., of Matamoras, as sole owners of the vessel, whereas, the captain’s instructions and other papers showed that C. F. Jenny was the owner.
These facts, doubtless, justified suspicion and warranted seizure. We must then inquire into the true character and ownership of tbie vessel and cargo, as shown by the prepara- ' tory evidence.
*185 It appears that the vessel was American built, and that her original name was Southron; and a paper found on board showed that Johnson, her master, had commanded in December, 1862, a schooner engaged in running the blockade from Mobile to Havana.
The Southron was sold under order of the United States sequestration commission in New Orleans to one P. A. Fronty, and a register was issued to him on the 18th of March, 1863.
She was probably soon after sold by Fronty, though he still remained master, to one Julius Sehlickum; for this person, on the 21st of April, made a bill of sale of her at Matamoras,- to Hale & Co., of that place.
Hale & Co. do not seem to have taken possession of her; for, on the same day, an irrevocable power of attorney was made by that firm to one Jacob liosenfeld, of Houston, in Texas, giving him or his substitute absolute control over the management and disposition of the schooner by sale or otherwise.
This paper was not signed by Hale & Co., but was drawn in their name, and signed by one John P. Molony,who, in a declaration of membership in the firm," dated six days later, represented himself as a partner.
These documents were not framed and executed in this irregular way by accident. In a letter to Johnson & Co., at Nassau, Jenny called Hale & Co. “the pretended owners,” and complained that Molony refused to make out the papers, as he, Jenny, wished, simply remarking to him, “ You have full and irrevocable power of attorney to do or not to do with the schooner whatever you please. I shall never interfere with you or your acts.”
On the same day that the declaration of ownership was made, a British provisional certificate of registry representing Fronty as master, and Hale & Co. as owners, was issued by the British vice-consul.
On the 12th of September, 1863, Bosenfeld transferred to Charles F. Jenny, of Matamoras, as his substitute, all the powers vested in him by the irrevocable power of attorney. *186 And on the 17th of the same month, Jenny made a like transfer to Saunders & Co., of Nassau, as his substitute.
Jenny appears to have exercised control over the vessel much earlier; for he appointed Johnson in place of Fronty, on the 27th of May; after which the schooner made a voy age to Havana and back, with Rosenfeld as supercargo.
In all transactions connected with the last voyage, Jenny acted as apparent owner; while Rosenfeld appeared only as a shipper of cotton. In the letter to Saunders & Co., already quoted, Jenny authorized the sale of the schooner at Nassau, and directed the remittance of the proceeds to his firm in Switzerland. In ease sale could not be effected at Nassau, he directed that the power and the papers of the ship should be transferred to Schlesinger & Co., of New York, the consignees there of the vessel and cargo, to whom he also wrote instructing them to sell the schooner, or, if not, to obtain a return cargo for her. In this letter he spoke of the vessel as “my schooner Jenny.”
This testimony leaves the ownership of the schooner in some doubt. The sale to Hale & Co. was most probably a mere cover. It is clear that, except in obtaining the British provisional registry, they never acted or held themselves out as owners; nor did they appear personally in this court to make claim for the vessel, or otherwise than through Johnson, who acted without instructions from them, and merely in his capacity as master. And he, in his preparatory deposition, said only, that the Jenny belonged to them, as far as he knew, but he did not know exactly.
Their irrevocable power of attorney to Rosenfeld, vested in him all the powers of owner, and made him owner in effect. After the transfer of the power, Rosenfeld was constantly connected with the schooner as supercargo and shipper of cotton. On the other hand, the conduct of Jenny and his apparently absolute control, indicates ownership of her. He may have acted, and probably did act under some arrangement with Rosenfeld, or they may have been connected in ownership. The former supposition is strengthened by the circumstance that Jenny disappeared from all apparent *187 connection with her, immediately after capture; while Hale & Co., the grantors of the Jenny to Rosenfeld, were brought forward as ostensible owners.
■ Thus far as to the vessel. We have already referred tc the claims for the cargo.
One of the claims was in behalf of Rosenfeld, who was presented in a new character. In the power of attorney executed at Matamoras, he was described as a resident of Texas. In the claim made in New Orleans, he was represented as a resident of that city, absent in Matamoras. The claim in his behalf was for the seventy-one bales. It is remarkable, if he was in fact a resident of New Orleans, that he has never claimed otherwise than through Johnson, and uever made any test affidavit at all. The truth, we apprehend is, that he was what the power of attorney declared him to be, — a resident of Texas, — and therefore, at that time, a rebel enemy of the United States.
The remainder of the cargo seems to have been shipped in good faith at Matamoras.
We are next to inquire what was the course, position, and conduct of the vessel at the time of capture, as shown by the preparatory evidence and the further proof.
She had recently come down the Rio G-rande from Matamoras. She was observed two days before the capture anchored in Texan waters, near the coast of Texas.* She wus probably there when she took on board the seventy-one bales belonging to Rosenfeld, which she received from lighters. When she left her anchorage, the Virginia sent a boat to intercept her, and she was brought to by a shot or two' from this boat. The mate of the Jenny says she was at this time about a mile from the shore. The officers of the Virginia make her distance from shore three miles or more, and her place from three to five miles south of the Ri<? Grande.
What are the conclusions of law from these facts ?■ In strictness the Jenny, having taken on part of her cargo off *188 the blockaded coast and having sailed from that coast, was» attempting to run the blockade when captured.
But we are not inclined to condemn the vessel on this ground, much less the forty-four bales and the thirty-nine bales, which were taken on board at Matamoras.
But it is an undoubted principle that in a case of libel as prize of war, the burden of proving the neutral ownership of the ship and cargo is upon the claimants. In this .case satisfactory proof is made of neutral ownership in the cotton laden at Matamoras. ■ But there is no proof at all of such ownership in the seventy-one bales put on board from lighters; and no satisfactory proof of such ownership in the schooner. On the contrary, the weight of the evidence is that these bales were owned by a rebel enemy; and that the same rebel enemy, either alone or in association with Jenny, who makes no claim, owned the schooner.
• It results that the forty-four bales and the thirty-nine bales must be restored to the claimants represented by the master, without contribution to costs or expenses, and that the seventy-one bales and the schooner must be condemned.
The decree below must be reversed and a decree entered
In conformity with this opinion.

 See chart, supra, p. 173.—Rep.