Henry ODENIRAN, Petitioner,

v.

HANLEY WOOD, LLC, Respondent.

No. 08–AA–634.

District of Columbia Court of Appeals.

Submitted Oct. 20, 2009.

Decided Dec. 17, 2009.

Henry Odeniran, pro se.

Respondent did not file a brief.

Before RUIZ and OBERLY, Associate Judges, and FARRELL, Senior Judge.

OBERLY, Associate Judge:

Under District law, a person who is fired from his job for "gross misconduct" is not eligible to receive unemployment compensation benefits until after the passage of a substantial waiting period, during which he must earn a prescribed level of wages with another employer. *See* D.C.Code § 51–110(b) (2001); 7 DCMR § 312.3. The issue on appeal is whether this rule applies to Henry Odeniran, an employee who was fired from his job because he intentionally failed to do his work throughout a single day despite being chided by his superiors. We answer this question in the negative, reverse an Office of Administrative Hearings Order reaching a contrary conclusion, hold that Odeniran was fired for simple, not gross, misconduct, and remand for further proceedings consistent with this opinion.

## I. Facts and Procedural History

Odeniran worked at Hanley Wood, LLC, a real estate market research firm,[1] from June 11, 2007 until March 17, 2008. Guy Sheetz, a Regional Manager at Hanley Wood, "clearly explained" to Odeniran when the latter was interviewing for a job at Hanley Wood that the company expected a consulting position to "open up" in the near future. Based on Sheetz's statements, and expecting to receive a promotion to a consulting position within a few months, Odeniran took a pay cut from the job that he held at the time and joined Hanley Wood as a Research Associate.

Unfortunately, Odeniran came to have an unhappy experience at Hanley Wood. To begin with, as the Administrative Law Judge hearing the case found, "because of the downturn in the real estate market, [Hanley Wood] disbanded its consulting business, so a promotion to [a consulting position] was no longer an option" for Odeniran. Odeniran also felt that his responsibilities as a Research Associate increased several times without a corresponding raise in pay. Moreover, Odeniran believed that Hanley Wood's parking reimbursement policy failed adequately to take into account the travel expenses that he incurred as part of his duties. To amelio-

---

1. As Odeniran explained, "the meat of [Hanley Wood's] business was collecting sales data for projects in different markets and selling it to builders, selling it to retailers, suppliers and they would use that information to make business decisions."

rate the parking costs, Odeniran asked that he be permitted to work from home.

On Wednesday, March 12, 2008, Odeniran approached Sheetz with what Sheetz termed an "ultimatum": as the ALJ found, Odeniran told Sheetz that he (*i.e.*, Odeniran) "needed to make more money and be able to work from home, or he would have to find another job." Sheetz responded that a pay raise for Odeniran was not in the cards "due to market conditions." Furthermore, although Hanley Wood permitted some employees to work from home, Sheetz felt that Odeniran's performance at Hanley Wood did not merit the telecommuting privilege.

On Friday, March 14, 2008, two days after Sheetz rejected Odeniran's "ultimatum," Odeniran told Sheetz via e-mail that he was taking a sick day. Sheetz testified that he "responded right away," telling Odeniran about two deadlines that Odeniran had that day. Odeniran, according to Sheetz, never replied to Sheetz's e-mail and missed both deadlines.

Odeniran was fired the following Monday, March 17, with the events leading up to his termination evolving as the day went on. At approximately 11:00 a.m.—two hours after Odeniran had arrived at work—Sheetz brought Odeniran "in" (presumably to his office) to "see if he was all right [*sic*]." Sheetz testified that it "appeared that, you know, walking by his office, [Odeniran] wasn't making phone calls, he wasn't doing any kind of work related to Hanley Wood." Sheetz, therefore, "advised [Odeniran that Sheetz] had been by his desk a couple times and [Odeniran] said he had a busy schedule." Sheetz also told Odeniran that Sheetz "needed him to concentrate on the work that we had to do, already behind because of Friday and we had some work to do."

Sheetz believed that Odeniran failed to do any work as the day went on. Thus, one half-hour after their initial conversation, Sheetz saw that Odeniran "was still on the Internet" and not performing his assigned tasks. By 3:00 p.m., Sheetz believed that Odeniran still "clearly" had done "no work." Sheetz asked Odeniran several times what he was working on; Odeniran responded that he was "busy with other stuff," but refused to provide details, which caused Sheetz to believe that Odeniran was lying.

Concerned about Odeniran's apparent failure to do his job, Sheetz contacted Margaret Connery, the Human Resources Director for Hanley Wood. Connery, who works out of a different office, telephoned Odeniran to ask what he had been working on, whether he would be reporting his time as "work hours," and whether he was working on a company computer. Odeniran told Connery that he preferred not to answer these questions. At the hearing on Odeniran's eligibility for unemployment compensation benefits, Odeniran testified that he "did not want to have that conversation with her in front of the other research associates because [he] felt that [Connery's questions related to] private business that should have been talked about in another, in another environment, in another more private room." It is not clear from the transcript whether Odeniran explained this concern to Connery when they spoke.

Odeniran was fired at the end of the day. According to Sheetz, Odeniran's March 12 "ultimatum" and the deadlines that Odeniran missed on March 14th, when he took a sick day, were "problem[s]" for Hanley Wood. As the ALJ found, however, Hanley Wood ultimately fired Odeniran not for the ultimatum or the missed deadlines, but rather due to Odeniran's "fail[ure] to perform his duties on March 17, 2008." As Sheetz summarized in his closing argument: "You know, for the last

eight months, you know, dating back to June 11th I had no doubt that Henry's attentiveness and job responsibilities and duties were performed. However the last week leading up to it was clearly the problem, most importantly the last day. Clearly, you know, as the evidence states, the work just was not being performed on [the 17th], so Hanley Wood does not pay employees for not doing anything. They do not pay employees for using their tablets, their property for personal use, things of that nature. So, unfortunately, you know, [Odeniran's] last day was on March 17th just due to the lack of work and effort that was being produced on the 17th." Sheetz also found it troublesome that Odeniran evidently had no "indication[ ] of planning on doing any work that particular day," notwithstanding that Sheetz and others had "talk[ed]" to Odeniran "multiple times." Odeniran, for his part, contended that Hanley Wood fired him because he had asked for a raise and to work from home, not because he failed to get work done on March 17th.

The ALJ credited Hanley Wood's "version of the material facts." The ALJ noted that whereas Hanley Wood's witnesses gave "detailed and consistent testimony" regarding the events of the 17th, Odeniran provided only "vague and incomplete responses to that testimony." Moreover, the ALJ thought that Odeniran's "disproportionate[ ]" focus at the hearing "on the several bases for his disgruntlement with [Hanley Wood], rather than on the question of whether he was performing his duties diligently on March 17, 2008" indicated that Odeniran in fact was not working on the day he was fired. Ultimately, the ALJ held that Odeniran was fired for gross misconduct, and thus was ineligible to receive unemployment compensation benefits at the time of his termination.

## II. Discussion

### A. Standard of Review.

Our review of agency decisions, although "deferential," is "by no means 'toothless.'" *Georgetown Univ. Hosp. v. District of Columbia Dep't of Employment Servs.*, 916 A.2d 149, 151 (D.C.2007). We review OAH's factual findings to ensure that they are supported by substantial evidence in the record. *Morris v. United States Envt'l Prot. Agency*, 975 A.2d 176, 180 (D.C.2009). Whether a fired employee's "actions constituted misconduct, gross or simple," is a legal question, *Washington Times v. District of Columbia Dep't of Employment Servs.*, 724 A.2d 1212, 1220 (D.C.1999), and our review of an agency's legal rulings is "*de novo*, for 'it is emphatically the province and duty of the judicial department to say what the law is,' and the judiciary is the final authority on issues of statutory construction." *Harris v. District of Columbia Office of Worker's Comp.*, 660 A.2d 404, 407 (D.C.1995) (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803)) (internal edit omitted); *see also Harris*, 660 A.2d at 407 (measure of deference is lessened where, as here, agency decision was not made by "the highest officers in the executive department of the government") (quotation marks omitted).

### B. Statutes and Regulations.

"A terminated employee who satisfies the basic requirements of the unemployment compensation statutes is presumed to be eligible for benefits. D.C.Code § 51–109 (2001). That presumption is rebutted, and the employee becomes ineligible for benefits, when the employer proves by a preponderance of the evidence that the employee was fired for misconduct. D.C.Code § 51–110 (2001). The District of Columbia distinguishes between 'gross misconduct' and 'misconduct, other than

gross misconduct,' which we have referred to as 'simple misconduct.' D.C.Code § 51–110(b)(1) and (2) (2001). Being discharged for gross misconduct has a different impact on unemployment benefits than being discharged for simple misconduct. *See* D.C.Code § 51–110(b) (2001)." *Morris,* 975 A.2d at 181 (one citation omitted).

■ "An employer seeking to prevent the payment of unemployment compensation bears the burden of proving that the employee engaged in misconduct (gross or otherwise). 7 DCMR § 312.2." *Morris,* 975 A.2d at 181. "[A] finding of misconduct must be based fundamentally on the reasons specified by the employer for the discharge." *Chase v. District of Columbia Dep't of Employment Servs.,* 804 A.2d 1119, 1123 (D.C.2002) (quotation marks omitted).

Gross misconduct is defined by regulation as "an act which deliberately or willfully violates the employer's rules, deliberately or willfully threatens or violates the employer's interests, shows a repeated disregard for the employee's obligation to the employer, or disregards standards of behavior which an employer has a right to expect of its employee." 7 DCMR § 312.3. Acts that "may" constitute gross misconduct include: "a. Sabotage; b. Unprovoked assault or threats; c. Arson; d. Theft or attempted theft; e. Dishonesty; f. Insubordination; g. Repeated disregard of reasonable orders; h. Intoxication, the use of or impairment by an alcoholic beverage, controlled substance, or other intoxicant; I. Use or possession of a controlled substance; j. Willful destruction of property; k. Repeated absence or tardiness following warning." 7 DCMR § 312.4.

Simple misconduct encompasses "those acts where the severity, degree, or other mitigating circumstances do not support a finding of gross misconduct." 7 DCMR § 312.5. Simple misconduct refers to "an act or omission by an employee which constitutes a breach of the employee's duties or obligations to the employer, a breach of the employment agreement or contract, or which adversely affects a material employer interest." *Id.* Simple misconduct "may include, but is not limited, to the following: a. Minor violations of employer rules; b. Conducting unauthorized personal activities during business hours; c. Absence or tardiness where the number of instances or their proximity in time does not rise to the level of gross misconduct; d. Inappropriate use of profane or abusive language." 7 DCMR § 312.6.

### C. Analysis.

**1. The ALJ committed legal error in concluding that Odeniran was fired for gross misconduct.**

■ The ALJ's factual findings are well supported in the record, and we do not disturb them. Thus, we accept the ALJ's determination that on the day that he was fired, Odeniran "was not performing his assigned duties," that Odeniran acted intentionally, and that Odeniran failed to do his work even though Sheetz, had spoken to him several times to express his "concern." We hold, however, that the ALJ committed legal error in holding that these facts establish that Odeniran engaged in "gross misconduct."

The ALJ gave two grounds for concluding that Odeniran was fired for gross misconduct. First, the ALJ relied on the definition of gross misconduct as an act that "deliberately or willfully threatens or violates the employer's interests ... or disregards standards of behavior which an employer has a right to expect of its employee." 7 DCMR § 312.3. The ALJ allowed that "an employee's poor performance on a single day might not ordinarily warrant disqualification for gross miscon-

duct." The ALJ ruled, nonetheless, that Odeniran's conduct fit within the definition of gross misconduct in § 312.3 because Odeniran "deliberate[ly] ... avoid[ed] his assigned tasks that day." Second, the ALJ held that in view of "Sheetz's several expressions of concern to [Odeniran] on March 17, 2008, and his several requests that [Odeniran] focus on his work, the record also shows that [Odeniran] repeatedly disregarded reasonable orders from his employer." We disagree with both pieces of the ALJ's analysis.

To begin with, the ALJ's application of the definition of gross misconduct in 7 DCMR § 312.3 proves too much. That regulation, to be sure, is necessarily functional and flexible, but context makes clear that it should not be read to "extend to the outer limits of its definitional possibilities." *Dolan v. United States Postal Serv.*, 546 U.S. 481, 486, 126 S.Ct. 1252, 163 L.Ed.2d 1079 (2006). This is evident first of all from the fact that 7 DCMR § 312.4 gives as examples of gross misconduct "sabotage," "arson," and "threats"—misdeeds that are far more egregious than every act that literally might be viewed as being encompassed within the definition of gross

misconduct in § 312.3.[2] Thus, even though the list of examples in 7 DCMR § 312.4 is illustrative, not exhaustive, it is difficult to read that list as doing anything other than recognizing that the types of conduct that constitute gross misconduct are narrower than what might come within a literal definition of that phrase. *Cf. Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 170, 127 S.Ct. 2339, 168 L.Ed.2d 54 (2007) ("normally the specific governs the general").

Examples illustrate the point. For instance, consider an employee who, despite knowing that his employer recycles paper and aluminum, throws an old newspaper and a soda can into the trash bin. Or imagine an employee who takes an unauthorized cigarette break. What about an employee who spends 15 minutes at work shopping online for personal purposes or takes a pen home from work? In some sense, of course, it is fair to say that such employees "deliberately or willfully threaten[ ] or violate[ ] the employer's interests [or] disregard[ ] standards of behavior which an employer has a right to expect of its employee." 7 DCMR § 312.3. But

---

**2.** Admittedly, the regulation also gives as examples of gross misconduct insubordination, dishonesty, and repeated disregard of reasonable orders, 7 DCMR § 312.4—acts that might seem at first blush to be both not as serious as arson and also as though they could encompass Odeniran's playing hooky at work. But the grouping of these acts alongside arson, threats, drug use, and the like strongly suggests that the regulation did not contemplate that *every* instance of what literally might be termed insubordination, dishonesty, or repeated disregard of reasonable orders would qualify as gross misconduct. *See Giles v. District of Columbia Dep't of Employment Servs.*, 758 A.2d 522, 527 (D.C.2000) ("Compared to the other examples of gross misconduct in the regulation ... it is less than clear whether the kind of disregard of orders in the routine performance of work evidenced in this case rises to the level of a

violation of the employer's rules, interests or standards of behavior sufficient to constitute gross misconduct ...."); *see also Dolan*, 546 U.S. at 486, 126 S.Ct. 1252 ("A word is known by the company it keeps—a rule that is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress.") (quotation marks and edit omitted). Consider, for instance, a personal assistant whose boss tells him to make an appointment for the boss "first thing in the morning." If the personal assistant makes the appointment only after getting coffee, but tells the boss that he complied with the directive, one might say that the personal assistant was guilty of dishonesty and insubordination. Yet it would be passing strange to treat the personal assistant the same for the purposes of the unemployment statute as someone who put a match to his workplace.

because 7 DCMR § 312.4 clarifies, through examples, that to constitute gross misconduct, an employee's misdeeds must be serious indeed, it would be absurd to view such commonplace actions as disqualifying an otherwise eligible employee from receiving unemployment compensation benefits. Therefore, the ALJ was wrong to hold that Odeniran was guilty of gross misconduct simply because one could say, without doing violence to the English language, that the literal definition of gross misconduct given in § 312.3 describes the conduct for which Hanley Wood fired Odeniran. *See Dolan,* 546 U.S. at 486, 126 S.Ct. 1252 ("The definition of words in isolation ... is not necessarily controlling in statutory construction." Therefore, although "considered in isolation, the phrase 'negligent transmission' could embrace a wide range of negligent acts committed by the Postal Service in the course of delivering mail, including creation of slip-and-fall hazards from leaving packets and parcels on the porch of a residence ... both context and precedent require a narrower reading, so that 'negligent transmission' does not go beyond negligence causing mail to be lost or to arrive late, in damaged condition, or at the wrong address.").

To be sure, Odeniran did more than just take a pencil home—in fact, as the ALJ found, on the day that he was fired, Odeniran purposely failed to do his job during the course of the entire day despite getting talkings-to from Sheetz and Connery. Nonetheless, we hold that Odeniran's actions do not constitute gross misconduct within the meaning of the unemployment benefits statute.

■ Several principles guide our analysis. First, we find instructive the canon of *expressio unius est exclusio alterius,* which embodies the common-sense principle that "when a legislature makes express mention of one thing, the exclusion of others is implied." *Council of District of Columbia v. Clay,* 683 A.2d 1385, 1390 (D.C.1996) (quotation marks omitted). Although the "*expressio unius* maxim ... must be applied with a considerable measure of caution," *id.,* it is useful "where the context shows that the draftsmen's mention of one thing ... does really necessarily, or at least reasonably, imply the preclusion of alternatives." *Independent Ins. Agents of Am., Inc. v. Hawke,* 211 F.3d 638, 644 (D.C.Cir.2000) (quotation marks omitted); *see also Barnhart v. Peabody Coal Co.,* 537 U.S. 149, 168, 123 S.Ct. 748, 154 L.Ed.2d 653 (2003) (*expressio unius* doctrine applies where "it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it"). This is such a case. The concept of people being terminated for poor work performance must have been familiar to the drafters of the unemployment benefits statute and regulations; this is not a case where the exclusion of an item from a list can be attributed to the drafters' understandable failure to anticipate (or reluctance to list) every far-flung hypothetical that could arise under a legal regime. Therefore, it is a fair surmise that the drafters of the regulations deliberately excluded intentional failure to work from the list of examples in 7 DCMR § 312.4, and did not view such conduct as *per se* amounting to gross misconduct.[3]

■ Second, our reading also has the advantage of giving effect to the distinc-

---

**3.** To be clear, we recognize that the list of examples in 7 DCMR § 312.4 is illustrative, not exhaustive; in other words, gross misconduct is not limited to the acts specified in the list. That said, we cannot close our eyes to the fact that the list omits the very conduct for which Odeniran was fired. *See Giles, supra* note 2, 758 A.2d at 527 (noting "that there is no mention of 'poor work performance' in the regulation defining gross misconduct").

tion that the regulations make between gross and simple misconduct. Where, as here, "individual subsections" of a statute or regulation are "capable of more than one reading, our task is to search for an interpretation that makes sense of the statute [or regulation] as a whole." *Cass v. District of Columbia,* 829 A.2d 480, 482 (D.C.2003); *see also 'Corley v. United States,* —— U.S. ——, ——, 129 S.Ct. 1558, 1566, 173 L.Ed.2d 443 (2009) ("one of the most basic interpretive canons [is] that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant") (quotations marks and edit omitted). In this case, if viewed in a vacuum, the definitions of gross misconduct and simple misconduct both could be read to cover an intentional failure to work. But the drafters of the unemployment statute could not have intended that outcome because it would eviscerate the distinction between gross and simple misconduct. *See Abuelhawa v. United States,* —— U.S. ——, ——, ——, 129 S.Ct. 2102, 2105, 2107, 173 L.Ed.2d 982 (2009) (declining government's invitation to give full "literal sweep" to term in criminal statute that

contained "distinction between simple possession and distribution of drugs" where government's broad reading of that term would cause "twelve-fold quantum leap in punishment for simple drug possessors").

Third, beyond the language of the regulations, our cases also reject the view that Odeniran's actions on the day of his firing constitute gross misconduct. It is true that we have stated that "unsatisfactory work performance may amount" to gross misconduct "in some instances," provided that the employee acted "intentionally." *Chase,* 804 A.2d at 1123 (quotation marks omitted); *see also Giles v. District of Columbia Dep't of Employment Servs.,* 758 A.2d 522, 526–27 (D.C.2000). Crucially, however, the requirement that the dismissed employee acted intentionally is only a necessary, not a sufficient, condition for a finding of gross misconduct. Thus, even though *Chase* and *Giles* held open the possibility that the employees in those cases were fired for gross misconduct for willful poor performance,[4] those cases involved situations where the employer demonstrated that the misconduct was ongoing[5] or had potential for grave consequences.[6] Hanley Wood, which bore

4. The court in both cases reversed the conclusion that the employee was fired for gross misconduct because the agency failed to make a finding that the employee acted intentionally and remanded for further proceedings on that issue. *Chase,* 804 A.2d at 1124; *Giles,* 758 A.2d at 526–27.

5. In *Giles,* 758 A.2d at 524, there was evidence that on "several occasions in the period between September 1994 and April 1995, Giles," an "experienced plumber," "failed to perform his job according to his employer's expectations" despite "a number of warnings exhorting Giles to improve his performance and setting forth the consequences if he did not."

6. *Chase,* 804 A.2d at 1120, involved a case of a maintenance technician at an apartment complex who, after responding to a tenant's complaint about a leak in a bedroom closet

ceiling, "announced there was nothing he could do until the next day and left" without informing his supervisor. *See also McCaskill v. District of Columbia Dep't of Employment Servs.,* 572 A.2d 443, 444, 446 (D.C.1990) (reversing and remanding Department of Employment Services conclusion that employee who "was fired from his job as a driver for the mentally retarded and the handicapped when his employer observed him driving down the street with the side door of the van open while clients were in the van" was ineligible to receive unemployment compensation benefits; dismissal in that case was based on violation of company policy, but there was insufficient evidence that employee was aware of policy, that it was consistently enforced, and that employee's violation was deliberate).

the burden of proof, did not present evidence that Odeniran's willful non-performance on March 17th was other than an isolated incident, nor did it contend that its business had suffered serious consequences as a result.[7]

Indeed, we are aware of no published decision from this court holding that an employee was fired for gross misconduct for engaging in acts remotely comparable to Odeniran's. Rather, our cases holding that an employee engaged in gross misconduct involved circumstances far more extreme than those presented here. For instance, in *Williams v. District Unemployment Comp. Bd.*, 383 A.2d 345, 347 (D.C.1978), we affirmed a finding that a meter reader for a utilities provider who "had thrown his flashlight through the glass storm door of a customer's home without justification" was fired for misconduct and thus disqualified from receiving unemployment benefits. *See also id.* at 348 (noting that flashlight was thrown at eye level, while the customer was standing immediately behind the storm door, and that the flashlight broke three panes of glass).[8] Odeniran's sitting at his desk and surfing the Internet, while far from commendable, plainly was not as egregious an act of misconduct as that of the meter reader in *Williams*. *Cf. District of Columbia v. Department of Employment Servs.*, 713 A.2d 933, 934, 937 (D.C.1998) (reversing and remanding on separate issue, but holding open possibility that employer could show that employee, a public school teacher, was disqualified from receiving unemployment benefits where employee was fired after employer learned that employee had been convicted of contempt of court for violating a "stay-away" order that had been entered against her in a "case involving matters unrelated to her job"). By contrast, we recently affirmed OAH's holding that an employee committed simple, not gross, misconduct even though there were "three documented instances" of the employee's engaging in "rude and disrespectful conduct toward [her employer's] customers." *Rodriguez v. Filene's Basement, Inc.*, 905 A.2d 177, 180 (D.C.2006) (quotation marks omitted). If repeatedly being rude and disrespectful toward an employer's customers is simple misconduct, failing to put in adequate "effort" on a single day, as Sheetz described Odeniran's performance on his last day at work, should be simple misconduct as well.[9]

---

7. Sheetz did testify that Odeniran missed two deadlines on the Friday before he was fired, but that does not change the result. To begin with, Sheetz argued that Odeniran was fired for his actions on March 17th, not because of the missed deadlines. Furthermore, Sheetz did not dispute Odeniran's claim that he missed work on the Friday because he was sick; if Odeniran missed work (and hence the deadlines) because he was sick, his absence cannot be the basis for a finding of gross misconduct. *Morris*, 975 A.2d at 182 ("Genuine illness that prevents an employee from coming to work negates the willfulness and deliberateness of her absenteeism, thereby preventing a finding of gross misconduct."). In any event, Sheetz did not explain what the "deadlines" were nor how missing them affected Hanley Wood's business.

8. Although *Williams* was decided before the D.C. Council passed legislation distinguishing between gross and simple misconduct, it remains relevant precedent on the meaning of gross misconduct. *Giles*, 758 A.2d at 527 n. 7 (citing *District of Columbia v. Department of Employment Servs.*, 713 A.2d 933, 937 (D.C. 1998)).

9. Of course, just because *Rodriguez* upheld an ALJ's finding that Rodriguez engaged in simple misconduct does not mean that the *Rodriguez* court would have reversed if the ALJ had held that Rodriguez was fired for gross misconduct. That said, analogy to *Rodriguez* is helpful because it demonstrates that the ALJ's view in this case of what constitutes gross misconduct is not necessarily representative of or consistent with the approaches taken by other ALJs facing the issue.

■ Finally, the ALJ's alternate ground for decision—that in view of "Sheetz's several expressions of concern to [Odeniran] on March 17, 2008, and his several requests that [Odeniran] focus on his work, the record also shows that [Odeniran] repeatedly disregarded reasonable orders from his employer"—also fails. For one thing, as explained above, although 7 DCMR § 312.4g gives "[r]epeated disregard of reasonable orders" as an example of gross misconduct, "it is less than clear," *Giles*, 758 A.2d at 527, that this regulation should be read to extend to its outer limits. Even assuming that the disregard of reasonable orders principle should be applied broadly, the ALJ's conclusion is insufficient for the simple reason that the ALJ did not cite, and the record does not reveal, that Odeniran *repeatedly* disobeyed any orders. The only thing that comes close to an "order" given to Odeniran was Sheetz's claim that at around 11:00 a.m. he told Odeniran that Sheetz "needed him to concentrate on the work that we had to do." Although Sheetz also stated that later in the day he asked Odeniran what the latter was working on but did not receive a satisfactory response, Sheetz did not describe any additional "or-

ders" that he gave Odeniran. As a result, there is not substantial evidence in the record that Odeniran violated "repeated" orders.[10]

## 2. Odeniran engaged in simple misconduct.

Although the facts in the record are insufficient to sustain the ALJ's conclusion that Odeniran was fired for gross misconduct, the record does make clear—and we hold—that Odeniran was terminated for simple misconduct. Simple misconduct, as mentioned above, refers to "an act or omission by an employee which constitutes a breach of the employee's duties or obligations to the employer . . . or which adversely affects a material employer interest." 7 DCMR § 312.5. Furthermore, 7 DCMR § 312.6 explicitly states that "[c]onducting unauthorized personal activities during business hours" may constitute simple misconduct. These regulations fit like a glove Odeniran's conscious decision to spend the day on the Internet instead of doing his job despite being chided more than once.[11]

## III. Conclusion

The ALJ erred as a matter of law in concluding that Odeniran was fired for

---

10. To be clear, we do not hold in this case that poor performance on a single day can never constitute gross misconduct. Our point, rather, is that in order to establish that it terminated an employee for gross misconduct, an employer needs to do more than show that the employee intentionally failed to work. Moreover, we emphasize that the question in this case is not whether Hanley Wood "was justified in [its] decision to discharge" Odeniran, for "[n]ot every act for which an employee may be dismissed from work will provide a basis for disqualification from unemployment compensation benefits because of misconduct." *Morris*, 975 A.2d at 182 (quotation marks omitted).

11. Odeniran's remaining arguments lack merit. Although Odeniran complains that Hanley Wood failed to present documentary evidence

of Odeniran's poor performance, he points to no authority, whether in the unemployment compensation statute, OAH regulations, rules, or elsewhere, that requires such evidence. Further, contrary to Odeniran's argument, it is of no moment that Hanley Wood did not present evidence comparing Odeniran's performance to the performance of his co-workers. When "a finding of misconduct . . . is predicated on the employee's violation of an employer's rule, the Appeals Examiner must also determine . . . '[t]hat the employer's rule is consistently enforced by the employer.'" *Chase*, 804 A.2d at 1123 (quoting 7 DCMR § 312.7). In this case, however, Hanley Wood was not relying on a specific rule, and thus was not obligated to introduce into evidence how it treated other employees.

gross misconduct. We hold, however, that Hanley Wood presented sufficient evidence to satisfy its burden of showing that it fired Odeniran for simple misconduct, and we remand the case to OAH for further proceedings consistent with this opinion.

*Reversed and remanded.*