**Joyce BENJAMIN, Petitioner**

v.

**WASHINGTON HOSPITAL CENTER, Respondent.**

**No. 09–AA–47.**

District of Columbia Court of Appeals.

Submitted May 11, 2010.

Decided Oct. 21, 2010.

---

**7.** Bd. Prof. Resp. R. 17.6.

**8.** D.C. Bar R. XI, § 12.1(d) (2009).

Joyce Benjamin filed a brief pro se.

Trina L. Fairley and Daniel M. Creekman, Washington, DC, were on the brief for respondent.

Before KERN, TERRY, and STEADMAN, Senior Judges.

TERRY, Senior Judge:

This is the latest in a series of recent cases that turn on the distinction between "misconduct" and "gross misconduct," as those terms are used in the statute and regulations which govern the availability and amount of unemployment compensation benefits.

Petitioner, Joyce Benjamin, seeks review of a final order of the Office of Administrative Hearings (OAH) which denied her application for unemployment compensation. A claims examiner with the Department of Employment Services (DOES), and subsequently the OAH, ruled that Ms. Benjamin was disqualified from receiving benefits because she had been fired from her employment for misconduct. We discern no error in that ruling. We hold, however, that a remand is necessary because both the DOES claims examiner and the OAH erroneously applied to Ms. Benjamin the penalties for an employee terminated for gross misconduct without making an explicit finding that she was terminated for gross misconduct, as opposed to "simple" misconduct—and, most importantly, without an explicit finding by the OAH that the misconduct was willful or deliberate, a prerequisite to a denial of benefits on the ground of gross misconduct. Because there are important distinctions between the two types of misconduct, particularly in the consequences to the terminated employee, we must remand the case for a *de novo* exercise of administrative discretion.

I

On September 11, 2008, Ms. Benjamin was fired from her job as a Unit Clerk at the Washington Hospital Center, where she performed various administrative duties, such as transcribing orders, answering telephones, and assisting visitors

at the front desk. Ms. Benjamin had worked for the hospital for more than six years, since August of 2002, with one break in service for about two months in 2008. At the start of her employment, she signed a form acknowledging receipt of an Employee Handbook, which stated, among other things, that "excessive absenteeism or lateness" was considered a "major violation" of work rules. Pursuant to a Collective Bargaining Agreement (CBA) with Local 722 of the Service Employees International Union, excessive lateness was defined as "the failure of a full-time employee to report to work within less than seven (7) minutes of the scheduled start time for more than six (6) times over [a] twelve-month period." The CBA further outlined a series of progressive sanctions for such violations, with a first violation resulting in a written warning, a second resulting in a suspension, and a third resulting in discharge. Ms. Benjamin was aware of this three-step process as set forth in the CBA. There is no evidence in the record of any workplace violations from August 2002 to April 2007.

In April 2007 Ms. Benjamin began working in Unit 4NW. On May 16 her supervisor in that unit, Bonnie Sines, issued a "Step I" warning notice to Ms. Benjamin for excessive tardiness. The notice listed nine instances of tardiness from April 12 to May 9, and stated that further violations would "result in further discipline up to and including termination." On September 20, 2007, Ms. Sines issued a "Step II" suspension notice for seven instances of tardiness between August 2 and September 14. Ms. Benjamin was suspended for two days and was warned that further violations would "lead to termination for cause."

On January 23, 2008, Ms. Sines issued a "Step III" termination notice to Ms. Benjamin, based on an alleged absence from the work area on January 16. That notice was later rescinded. Thereafter, on April 8, Ms. Benjamin signed a "Last Chance Agreement" stating that "any violation . . . including but not limited to: excessive absences and/or tardiness . . . shall be deemed just cause for immediate discharge." Ms. Benjamin was then transferred to Unit 4E, where her supervisor was Quindella Williams.

On September 11, 2008, Ms. Williams issued to Ms. Benjamin a notice of termination for "excessive tardiness," which Ms. Benjamin signed. The notice listed eight instances of tardiness between June 13 and September 11. As a result, Ms. Benjamin was fired for violating the terms of the CBA and the Last Chance Agreement, and for reaching the third disciplinary step.

Upon her discharge, Ms. Benjamin applied to DOES for unemployment compensation benefits. After a hearing, a claims examiner ruled that she was ineligible for compensation because the evidence showed that she had been discharged for misconduct. The claims examiner did not expressly state that Ms. Benjamin had been discharged for "gross misconduct." However, in finding that she was terminated for "misconduct," the examiner cited D.C.Code § 51–110(b)(1) (2001), the specific statute limiting unemployment benefits for employees terminated for "gross misconduct." Further, the examiner stated that Ms. Benjamin would be ineligible for benefits "until such time as you have been employed in each of ten (10) weeks (whether or not consecutive), have earnings from this employment equal to not less than ten (10) times your Weekly Benefit Amount, and become unemployed through no fault of your own." This language mirrors that found in section 51–110(b)(1), which prescribes a period of ineligibility for anyone who has been terminated for gross miscon-

duct.[1] The examiner specifically found, "You were discharged from your job with your most recent employer for excessive tardiness that continued after you had been warned.... Your unexcused and repeated failure to report to work on time constitutes a willful disregard of your employer's interest."

Ms. Benjamin appealed from the claims examiner's decision to the OAH, where an administrative law judge (ALJ) held an evidentiary hearing and, in due course, issued a final order. The ALJ, like the claims examiner, did not find that Ms. Benjamin had been discharged for gross misconduct. Rather, in affirming the claims examiner's decision, the ALJ stated, "Employer has shown that Claimant's conduct, which forms the bases for the disciplinary notices, occurred and is misconduct." However, among her findings, the ALJ recited the definition of gross misconduct found in 7 DCMR § 312.3. The ALJ also noted that, in accordance with 7 DCMR § 312.4, gross misconduct may include repeated absence or tardiness after warning.[2] The ALJ did not make any findings about how, if at all, Ms. Benjamin's tardiness had affected the administration of her employer's business, or whether Ms. Benjamin's conduct had been willful or deliberate. Ms. Benjamin now asks this court to review that final order.

## II

This court has repeatedly emphasized the important distinction between gross and simple misconduct. *See, e.g., Odeniran v. Hanley Wood, LLC,* 985 A.2d 421, 424–425 (D.C.2009); *Chase v. District of Columbia Dep't of Employment Services,* 804 A.2d 1119, 1122 (D.C.2002). We have observed that "[b]eing discharged for gross misconduct has a different impact on unemployment benefits than being discharged for simple misconduct." *Odeniran,* 985 A.2d at 425 (quoting *Morris v. United States Environmental Protection Agency,* 975 A.2d 176, 181 (D.C.2009)). In reversing an ALJ's determination in *Odeniran* that an employee had been terminated for "gross misconduct," we said that "to constitute gross misconduct, an employee's misdeeds must be serious indeed...." 985 A.2d at 427. We noted that the examples given in 7 DCMR § 312.4 illustrate that actions constituting gross misconduct are "misdeeds that are far more egregious than every act that literally might be viewed as being encompassed within the definition of gross misconduct in § 312.3." *Id.* at 426. The employee in *Odeniran* was terminated because of his purposeful failure to do his work during the course of a single day, despite warn-

---

1. Section 51–110(b)(1) provides in part:

   [A]ny individual who has been discharged for gross misconduct occurring in his most recent work, as determined by duly prescribed regulations, shall not be eligible for benefits until he has been employed in each of 10 successive weeks (whether or not consecutive)....

   Section 51–110 was amended in 2004, but the amendment involved a different subsection and had no effect on this case. *See* Historical and Statutory Notes following D.C.Code § 51–110 (2009 Repl.).

2. 7 DCMR § 312.3 provides:

   For purposes of [D.C.Code § 51–110(b)(1)], the term "gross misconduct" shall mean an act which deliberately or willfully violates the employer's rules, deliberately or willfully threatens or violates the employer's interests, shows a repeated disregard for the employee's obligation to the employer, or disregards standards of behavior which an employer has a right to expect of its employee.

   7 DCMR § 312.4 provides in part:

   Gross misconduct may include, but is not limited to, the following:

   *   *   *   *   *   *

   (k) Repeated absence or tardiness following warning.

ings from two supervisors. We found it significant that the employer did not show that the employee *"repeatedly* disobeyed any orders," *id.* at 430 (emphasis in original), or that the employer's "business had suffered serious consequences as a result" of the employee's misconduct. *Id.* at 429.

In the more recent case of *Doyle v. NAI Personnel, Inc.,* 991 A.2d 1181 (D.C.2010), we reversed a DOES denial of benefits based on a finding of gross misconduct when the misconduct consisted of the employee's failure to notify her employer, a staffing agency, that her current placement assignment had ended. We held that this conduct "falls short—in terms of 'seriousness' or 'egregiousness' ...—even of the deliberate refusal to do work despite reproof found insufficient in *Odeniran.*" *Id.* at 1184. Again we noted that the employer had failed to show that its business "'had suffered serious'—or indeed any—'consequences as a result' of petitioner's unavailability." *Id.* (citing *Odeniran,* 985 A.2d at 429).

■■■ "An administrative order can only be sustained on the grounds relied on by the agency; we cannot substitute our judgment for that of the agency." *Jones v. District of Columbia Dep't of Employment Services,* 519 A.2d 704, 709 (D.C. 1987) (citations omitted); *see SEC v. Chenery Corp.,* 318 U.S. 80, 94–95, 63 S.Ct. 454, 87 L.Ed. 626 (1943). "An appellate court cannot stand in the place of an administrative agency and attempt to determine how the administrative agency would have decided a matter if part of its decisional base is in error for failure to address all relevant contentions." *Douglas–Slade v. United States Dep't of Transportation,* 959 A.2d 698, 702 (D.C.2008) (citation omitted). " 'Absent an analysis staking out an agency position to which this court normally

would accord some deference,' ... we have no choice but to remand for clarification." *Long v. District of Columbia Dep't of Employment Services,* 570 A.2d 301, 302 (D.C. 1990) (citations omitted).

■■■ In this case, both the claims examiner and the ALJ failed to find specifically that Ms. Benjamin was discharged for gross misconduct. However, because of the ALJ's affirmance of the claims examiner's decision, the consequence to Ms. Benjamin would be a period of ineligibility equal to that of an employee who has been discharged for gross misconduct. "Given that a finding of gross misconduct entails a far more severe penalty than that for simple misconduct, it is obviously important that DOES examiners, when confronted with allegations of 'misconduct,' make an explicit and unambiguous finding as to which type of misconduct, if any, led to an employee's termination." *Chase,* 804 A.2d at 1122. Furthermore, even if we could infer from the context here that the ALJ made such a determination, her decision is silent as to any finding that the misconduct was willful or deliberate, as the regulation requires.[3] As we pointed out in *Larry v. National Rehabilitation Hospital,* 973 A.2d 180 (D.C.2009), the fact that an employee's conduct falls within the examples of gross misconduct listed in the regulation is insufficient without an additional finding of willfulness or deliberateness. *Id.* at 183. Under the circumstances, "we have no choice," as we said in *Long,* 570 A.2d at 302: we must remand this case for an explicit finding by the ALJ, on behalf of the OAH, as to which type of misconduct— gross or "simple"—led to Ms. Benjamin's termination.

Our holding is compelled especially by the presence of factors in Ms. Benjamin's

---

**3.** The claims examiner, however, did find that Ms. Benjamin's "unexcused and repeated failure to report to work on time constitute[d] a willful disregard of [her] employer's interest."

case that could conceivably support a finding either way. As the ALJ noted, "repeated absence or tardiness after warning" is "an enumerated example of gross misconduct" under the applicable regulations. *See* 7 DCMR § 312.4(k), *supra* note 2. Further, it is at least possible that one of the factors identified in *Odeniran* as distinguishing gross misconduct from simple misconduct—the repeated nature of the violation—was present here. During the periods in question, Ms. Benjamin was apparently "tardy" (*i.e.*, more than six minutes late) on twenty-four separate occasions. As this court said many years ago, in language quoted by the ALJ, "Attendance at work is an obligation which every employee owes to his or her employer, and poor attendance, especially after one or more warnings, constitutes misconduct sufficient to justify the denial of a claim for unemployment benefits." *Shepherd v. District of Columbia Dep't of Employment Services*, 514 A.2d 1184, 1186 (D.C.1986).

In *Larry v. National Rehabilitation Hospital, supra*, an ALJ ruled that an employee was ineligible for unemployment benefits because she had been fired "on account of absenteeism that constituted 'gross misconduct.' " 973 A.2d at 181. The employer—coincidentally, a hospital, just as in this case—had established "a progressive disciplinary scale," under which any employee who was late or absent would be assessed a specified number of points for every unexcused absence, leading to "the possibility of discharge after eight points." *Id.* A supervisor testified that the employer's time and attendance policy "was a 'no fault' policy and that the [employer] did not 'accept documentation from a doctor as excuse of absenteeism.' " *Id.* The employee was fired after her absence on one particular day raised her point total to nine and a half points.

At the OAH hearing, the employee presented "medical evidence that she was seriously sick on the day in question...." *Id.* at 183. The ALJ found nevertheless that the employee's violation of the attendance policy constituted gross misconduct, rendering her ineligible for unemployment benefits. Even though the employee "offered her illness as a reason for her absence sufficient to negate a finding of gross misconduct ... the ALJ, while admitting the evidence, made no finding as to its credibility." *Id.* at 184. Because such a credibility finding "was essential to a determination that [her] absence was willful or deliberate, a prerequisite to an ultimate finding of 'gross misconduct,' " *id.* at 181, we concluded that the finding of gross misconduct was not supported by substantial evidence and remanded the case for further proceedings.

The employer in *Larry*, like the employer and the ALJ in the instant case, relied on the language quoted above from *Shepherd*. We acknowledged that it remained valid, noting that "[c]learly, employers have a reason to discharge an employee who does not regularly show up for work...." *Id.* at 184. We went on to say, however, that "the issue whether the employee was discharged for 'gross misconduct' is a distinct issue which depends on the underlying reasons for the absences." *Id.* We noted that even in *Shepherd* there was evidence before the ALJ "which, if believed, would support a decision in favor of Mr. Shepherd." 514 A.2d at 1186. Thus the "key question" in *Larry* was "whether [the employee's] absence ... was willful or deliberate," 973 A.2d at 184, and that question was not answered by the ALJ's decision.

Read together, *Larry* and *Shepherd* recognize that an employer may fire an employee for excessive absenteeism, but that a heightened standard of proof must be

satisfied before such absenteeism may be regarded as "gross misconduct."[4] It may be that in the specific context of a hospital, where even administrative duties are connected in some way to patient care, Ms. Benjamin's repeated tardiness could qualify as gross misconduct under the standards articulated in *Odeniran*. On the other hand, the evidence might also support a finding of simple misconduct, which may include "[a]bsence or tardiness where the number of instances or their proximity in time does not rise to the level of gross misconduct." 7 DCMR § 312.6(c). Thus whether a workplace violation such as tardiness or absence amounts to gross misconduct would depend, almost as a matter of course, on a finding of repeated infractions,[5] as well as consideration of any reasons presented for their occurrence. See note 6, *infra*.

We are not suggesting in any way that the employer's actions in enforcing its rules were not reasonable. Certainly, the record shows that the rules and the various levels of discipline were made clear to Ms. Benjamin at every step of the process. But it is at least arguable that the mere fact that Ms. Benjamin was "repeatedly" tardy would not be enough to compel a finding of gross misconduct under this court's precedents, which require for gross misconduct "a heightened showing of seriousness or aggravation." *Doyle*, 991 A.2d at 1183. Because neither the statute nor the regulations tell us how many instances of tardiness would be necessary to support a finding of gross as opposed to simple misconduct, or how close together in time they must be, it follows that the agency in each case must make that determination—*i.e.*, must find either gross or simple misconduct, depending on the facts of the case—in the first instance. *See Long*, 570 A.2d at 302. In this case it did not do so.

Moreover, the ALJ did not make findings on other factors which we have deemed either necessary or relevant to a gross misconduct determination. We have specifically identified "willfulness" or "deliberateness" as a factor necessary to a finding of gross misconduct. *Morris*, 975 A.2d at 182 ("prior to a finding of gross misconduct, the employer must prove that the employee's actions were willful and deliberate"); *Chase*, 804 A.2d at 1124 ("a violation of an employer's rule constitutes gross misconduct only when done 'deliberately or willfully'"). Conspicuously absent from the ALJ's determination here is any finding that Ms. Benjamin's tardiness was "willful."[6] On remand, the agency must

4. The question of whether the absenteeism in *Larry* might have constituted non-gross or "simple" misconduct was not presented, and therefore was not addressed in our opinion. *See* 973 A.2d at 184 n. 5.

5. In addition, under the terms of the CBA, Ms. Benjamin could be cited for a violation so as to trigger the next step in the discipline process if she were tardy "more than six (6) times." Thus seven instances of tardiness would constitute, at least under the CBA, the minimum amount of wrongdoing that an employee could commit and still be cited for a violation.

For Ms. Benjamin's first tardiness violation, she was tardy on nine occasions, two times more than this minimum; for the second, she was tardy seven times; for the third violation, she was tardy eight times, one more than the minimum. Moreover, many of her instances of tardiness barely exceeded the six-minute grace period allowed by the CBA; the only really lengthy one was thirty-nine minutes.

6. Ms. Benjamin presented some evidence that, if believed, might cast some doubt on a finding of willfulness. She asserted that she relied on public transportation to get to work, implying that her tardiness was not entirely within her control. Ms. Benjamin also called into question the accuracy of the employer's information, stating that on "a lot" of the days noted in her attendance record she actually arrived within the six-minute grace period, and that Ms. Williams never approached

find that Ms. Benjamin's rule violation was willful or deliberate before it can conclude that she was discharged for gross misconduct.

We have also identified consequences to the business operations of the employer as a factor at least relevant to a determination of gross misconduct. *See Doyle,* 991 A.2d at 1184; *Odeniran,* 985 A.2d at 429. Here as in *Doyle,* the agency did not make findings about what negative consequences, if any, the hospital may have suffered as a result of Ms. Benjamin's rule violations, except to say that the tardiness rule was reasonable because it enabled the hospital to provide "reliable patient care." While we do not go so far as to require a specific finding that the hospital suffered serious consequences before the OAH can determine that Ms. Benjamin was fired for gross misconduct, under the case law this is at least a relevant consideration.

### III

To sum up, we hold that the ALJ did not err in ruling that Ms. Benjamin was disqualified from receiving unemployment compensation benefits for a period of time because she was terminated for misconduct, namely, successive violations of her employer's attendance policy. The ALJ further found, in accordance with 7 DCMR § 312.7, that Ms. Benjamin was aware of the policy, that the policy was reasonable, and that the employer consistently enforced it. *See, e.g., Jones v. District of Columbia Dep't of Employment Services,* 558 A.2d 341, 342–343 (D.C.1989). As we have said, repeated instances of tardiness

or absence, after warnings, may constitute at least simple misconduct. *See* 7 DCMR § 312.6(c). Substantial evidence therefore supports the ALJ's finding of misconduct, and to that extent the order denying compensation is affirmed. However, for the reasons we have stated, we must remand the case to the OAH for a *de novo* determination, as required under the case law, as to whether Ms. Benjamin was terminated for gross or simple misconduct.[7]

The final order of the OAH is affirmed in part and reversed in part. The case is remanded to the OAH for further proceedings consistent with this opinion.

*Affirmed in part, reversed in part, and remanded for further proceedings.*

---

her about her absences until she received the termination notice on September 11, the day she was fired. Finally, she testified that she did not intentionally arrive late, that on several occasions she called in to explain an emergency, and that she was sorry about her tardiness.

**7.** In fairness to the ALJ and the claims examiner, we note that their rulings were made before this court issued its decisions in *Larry, Morris,* and *Odeniran,* the three cases which lead us to conclude that a remand is necessary.