Kathleen AMEGASHIE, Petitioner,

v.

**CCA OF TENNESSEE, Respondent.**

**No. 06–AA–194.**

District of Columbia Court of Appeals.

Submitted June 24, 2008.
Decided Oct. 2, 2008.

---

Kathleen S. Amegashie, filed a brief pro se.

No brief was filed on behalf of respondent.

Before WASHINGTON, Chief Judge, BLACKBURNE–RIGSBY and THOMPSON, Associate Judges.

THOMPSON, Associate Judge:

Petitioner Kathleen Amegashie seeks review of a decision of the Office of Administrative Hearings ("OAH") holding that she was terminated for "gross misconduct" and thus was ineligible for unemployment benefits. We conclude that the OAH decision is not supported by substantial evidence in the record, and we therefore reverse.

## I.

On August 31, 2005, a Department of Employment Services Claims Examiner determined that Amegashie was "Not Discharged for Misconduct" and that she was eligible for unemployment benefits. Her employer, CCA of Tennessee ("CCA") ap-

pealed to OAH, which conducted a hearing on October 18, 2005. The evidence at the hearing was as follows.

Respondent CCA hired Amegashie on December 29, 2003, as a correctional officer. She was terminated on June 20, 2004,[1] then rehired on September 13, 2004. She worked at the Correctional Treatment Facility ("CTF") located at 1901 E Street, S.E., operated by CCA, apparently under a contract with the District of Columbia Department of Corrections.

When Amegashie was rehired in September 2004, she requested permission to correspond with a friend, Odell Griffin, who was incarcerated at the D.C. Jail, which is located at 1900 E Street, S.E., in close proximity to the CTF. D.C. Jail is operated by the Department of Corrections, not by CCA. Amegashie sent her request in a letter to CTF Warden Fred Figueroa, with copies to CTF Chief of Investigations Don Paul and CTF Chief of Security Ariel Ramos. She testified that two or three days later, Assistant Warden Jacquelyn Banks informed her that "the Chief"—she assumed that Assistant Warden Banks was referring to Chief of Security Ramos[2]—would not allow her to communicate with an inmate at D.C. Jail. Amegashie then went to see both Chief Ramos and Chief Paul, both of whom informed her that they "didn't see a problem ... as long as [the inmate] was not at CTF."

On February 2, 2005, after finishing her shift at CTF, Amegashie was searched as she exited the building, as was standard procedure. The guards found in her bag correspondence from two inmates—a letter from CTF inmate Otis Bridges to Delegate Eleanor Holmes Norton, and a personal letter to Amegashie from D.C. Jail inmate Griffin. Amegashie testified that she came into possession of inmate Bridges' letter by volunteering to take his letter to the CTF mailroom since the mail had already been picked up for his unit that day. When she found that the mailroom was closed, she decided to drop the letter in a mail drop box that was within the CTF facility, but beyond the security point at which she was searched. She further testified that the personal letter from Griffin had arrived at her house by U.S. mail just as she was leaving for work, and that she had put the letter in her bag to read while riding the subway.

On February 16, 2005, CCA terminated Amegashie for misconduct. According to the testimony of Assistant Warden Banks, her misconduct was as described in a "CCA Employee Problem Solving Notice" dated February 11, 2005, conduct that CCA alleged to be a violation of CCA CTF Policy 3–3. The February 11, 2005 notice stated in pertinent part[3] that:

> Correctional Officer Kathleen Amegashie has violated the Corrections Corporation of America/Correctional Treatment Facility Policies 3–3 (Standards of Ethics and Conduct) [by] continuing a correspondance [sic] between inmate Odell Griffin ... at the Central Deten-

---

1. The record does not explain the circumstances of the 2004 termination. We note, however, that petitioner's brief implies that her 2005 termination that gave rise to this benefits dispute was motivated by prejudice against her because of her "prior EEO activity."

2. Amegashie acknowledged that Assistant Warden Banks is superior to Chief Ramos, but explained that "we never called the warden chief."

3. The February 11, 2005 notice also described as misconduct Amegashie's having transported inmate Bridges's letter but, at the OAH hearing, CCA representatives did not assert that this conduct warranted denial of unemployment benefits.

tion Facility after the facility administrator (Warden Fred Figueroa) denied such correspondance [sic].

Assistant Warden Banks testified that CCA CTF Policy 3–3 had been revised on January 1, 2004. A copy of the revised policy (*i.e.*, the policy that was in effect at all times relevant to this dispute) was not introduced into evidence at the OAH hearing, but a copy of the pre-January 2004 policy (set out in a memorandum that Amegashie signed on December 29, 2003, to acknowledge her receipt) was introduced as Exhibit 102. In pertinent part, Exhibit 102 states:

> (2) Staff members are prohibited from receiving correspondence through the United States Postal Service, the interfacility mail, or direct delivery when the correspondence is of a personal nature.... Staff members are not allowed to initiate, participate in or pursue personal relationships with current or former inmates.... (7) Employees must notify their supervisors immediately, if a family member is incarcerated at the Correctional Treatment Facility or any D.C. Department of Corrections facility.

Following the OAH hearing, Administrative Law Judge (ALJ) Calonette McDonald issued a Final Order, dated February 6, 2006, reversing the determination of the Claims Examiner and finding that Amegashie was aware of and violated the CCA "policy prohibiting personal communication between staff and inmates," and concluding that she was ineligible for unemployment benefits. This petition followed.

## II.

This court must affirm a decision of the OAH if (1) the OAH made findings of fact on each materially contested issue of fact, (2) substantial evidence supports each finding, and (3) the OAH decision flows rationally from its finding of fact. *See Rodriguez v. Filene's Basement, Inc.*, 905 A.2d 177, 180 (D.C.2006). Substantial evidence is "more than a mere scintilla," but rather is "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Id.* at 181; *see also Gardner v. District of Columbia Dep't of Employment Servs.*, 736 A.2d 1012, 1015 (D.C.1999).

## III.

Pursuant to D.C.Code § 51–109, an unemployed individual is eligible to receive benefits so long as the individual meets certain statutory requirements. In general, an individual "who has been discharged for gross misconduct occurring in his most recent work ... shall not be eligible for benefits...." D.C.Code § 51–110(b)(1); *see also Washington Times v. District of Columbia Dep't of Employment Servs.*, 724 A.2d 1212, 1217 (D.C.1999). The burden is on the employer, however, to establish that an employee who would otherwise be eligible for benefits was terminated for gross misconduct. *See Chase v. District of Columbia Dep't of Employment Servs.*, 804 A.2d 1119, 1122 (D.C. 2002). "Gross misconduct" is defined by 7 DCMR § 312.3 as "an act which deliberately or willfully violates the employer's rules, deliberately or willfully threatens or violates the employer's interests, shows a repeated disregard for the employee's obligation to the employer, or disregards standards of behavior which an employer has a right to expect of its employees."

As ALJ McDonald noted in her citation to applicable law, 7 DCMR § 312.7 provides that:

> If a violation of the employer's rules is the basis for a disqualification from ben-

efits ..., the Director shall determine the following:

(a) That the existence of the employer's rule was known to the employee;

(b) That the employer's rule is reasonable; and

(c) That the employer's rule is consistently enforced by the employer.

Thus, implicit in ALJ McDonald's ruling is a finding that Amegashie deliberately or willfully violated consistently-enforced CCA rules of which she was aware. This finding is not supported by substantial evidence in the record. Although the ALJ found that Amegashie "was aware of" CCA policy prohibiting her from receiving mail from Griffin and that "[a]ll staff members known to have violated this rule have been disciplined" the record contains substantial uncontroverted evidence to the contrary— evidence that the ALJ failed to discuss or discredit, and that, we conclude, overcomes the scintilla of evidence on which the ALJ relied for her conclusion.

As noted earlier, neither CCA nor petitioner offered into evidence a statement of revised CCA Policy 3–3 that went into effect on January 1, 2004, and the February 11, 2005 CCA Employee Problem Solving Notice that was admitted into evidence did not quote Policy 3–3 as in effect on the relevant dates. Thus, the record does not contain a precise statement of the applicable employer policy.[4] There also was no testimony that the revised policy was identical in all material respects to the prior policy set out in Exhibit 102.

But even assuming that the applicable policy was identical in all material respects to the policy set out in Exhibit 102, the policy, which is printed on "Correctional Treatment Facility" letterhead, did not clearly prohibit Amegashie's conduct in issue. The critical fact is that the sentences of Exhibit 102 stating that CTF "[s]taff members are prohibited from receiving correspondence through the United States Postal Service ... when the correspondence is of a personal nature" and that "[s]taff members are not allowed to initiate, participate in or pursue personal relationships with current or former inmates" do not state that these prohibitions apply with respect to an individual who ·is a current or former inmate *of a facility other than CTF.*[5]

Moreover, the ALJ heard uncontroverted testimony, from both Amegashie and her fellow correctional officer and union president Rochelle Vaughan, that CTF administrators did not interpret Policy 3–3 to prohibit correspondence with a non-CTF inmate. According to Amegashie's testimony, Assistant Warden Banks, who received (for forwarding to Warden Figueroa) Amegashie's letter request to correspond with Griffin, preliminarily advised Amegashie that she "didn't see a problem with this [*i.e.,* corresponding with an inmate who was not at CTF but in D.C. Jail]." Banks testified that Amegashie's request thereafter "was denied" by the "Official Warden," but Amegashie testified

---

**4.** The OAH decision states that the relevant policy was revised January 24, *2002* (italics added), but that is the date of the *prior* policy statement set out in Exhibit 102.

**5.** It is noteworthy that, by contrast, the portion of Exhibit 102 that states that "[e]mployees must notify their supervisors *immediately,* if a family *member* is incarcerated" specifies that this notification must be given if the incarceration is "at the Correctional Treat-

ment Facility or any D.C. Department of Corrections facility." The specific language used in that sentence, but lack of specification in the policy statement's two sentences about correspondence and personal relationships with inmates, makes it at least ambiguous whether those two sentences purport to apply with respect to inmates of non-CTF, Department of Corrections facilities.

more specifically that the denial was a "verbal denial from Ms. Banks" in which Banks relayed only that the "Chief" was requiring Amegashie to "break contact" with Griffin. Subsequently, Amegashie testified, when she went to see Security Chief Ramos and Investigations Chief Paul to discuss and clarify the matter, both men responded that they "didn't see a problem ... as long as [the inmate] was not at CTF."

Further, union president Vaughan testified that when she spoke with Warden Figueroa about why Amegashie had been disciplined, "[Figueroa] said ... that he told Ms. Amegashie himself that there was no problem with that, because the inmate was not housed at the CTF." Vaughan—who explained that her job as union president entailed discussing employee discipline cases with shop stewards, reviewing disciplinary documents, and preparing to assist with employee grievances—also testified "[t]here's no specific policy" referring to "corresponding with inmates of other facilities" and that "[t]he rule and policy at CTF is you are not to correspond with any inmate who is housed at the CTF or has been housed at the CTF."[6] Taken together, the foregoing testimony-none of which the ALJ explicitly discredited—showed at the very least that if Policy 3–3 did purport to prohibit correspondence such as that between petitioner and Griffin, the policy was not consistently under-

stood or enforced.[7] Thus, even with an assumption that Amegashie was aware of the content of CTF Policy 3–3 as in effect on February 2, 2005, the ALJ had no basis for concluding that, on or about that date, she knew that the policy precluded her from receiving correspondence from Griffin.

In addition, Amegashie testified that, upon her re-hiring in September 2004, she notified CTF administrators of her friendship with D.C. Jail inmate Griffin. This was notwithstanding the fact that Policy 3–3 as set out in Exhibit 102 requires that employees notify their supervisors immediately only if "a *family member* is incarcerated at the Correctional Treatment Facility or any D.C. Department of Corrections facility." Amegashie testified that she gave this notification "out of respect ... for CCA" and did so even though "[t]here was nothing that said I had to put his name down or ask permission to see him...." This testimony, which the ALJ did not discredit, does not support a finding that petitioner deliberately or willfully violated CCA rules.

Because "the record in this case is too thin to support" the ALJ's conclusion that petitioner deliberately or willfully violated an unambiguous and consistently-enforced employer rule, *Jadallah v. District of Columbia Dep't of Employment Servs.*, 476 A.2d 671, 677 (D.C.1984), the ALJ erred in finding that respondent met its burden of

---

6. Vaughan also testified that her understanding was that the policy statement that "[s]taff members are prohibited from receiving correspondence through the United States Postal Service ... when the correspondence is of a personal nature" prohibits "getting personal mail inside the facility for you."

7. As noted earlier, ALJ McDonald found that "[a]ll staff members known to have violated this rule have been disciplined." However,

no evidence to this effect was presented at the hearing. Union president Vaughan did testify that disciplinary situations like petitioner's had "been discussed before with management." But she also testified that she had told Warden Figueroa, in the conversation in which she questioned him about why petitioner had been disciplined, that "[c]orresponding with an inmate that's at D.C. Jail ... [t]here's never been a problem [with that] before."

establishing that petitioner committed gross misconduct that rendered her ineligible for unemployment benefits. Accordingly, the decision of the OAH is reversed, and the matter is remanded with directions that petitioner Amegashie be awarded unemployment compensation benefits.

*So ordered.*