Taj GILMORE, Petitioner,

v.

ATLANTIC SERVICES GROUP,
Respondent.

No. 09–AA–488.

District of Columbia Court of Appeals.

Submitted March 24, 2011.
Decided April 7, 2011.

Taj Gilmore, pro se.

Respondent Atlantic Services Group did not file a brief.

Jennifer Mezey, and Bonnie I. Robin–Vergeer, Washington, DC, were on the brief, for amicus curiae, the Legal Aid Society of the District of Columbia, supporting petitioner.

Before REID and FISHER, Associate Judges, and FERREN, Senior Judge.

REID, Associate Judge:

Petitioner Taj Gilmore asks us to review the decision of the District of Columbia Office of Administrative Hearings ("OAH") upholding the Department of Employment Services' ("DOES") determination that he was disqualified from receiving unemployment insurance benefits. We reverse and remand for the reasons stated below.

**I.**

The record shows that Mr. Gilmore was employed as a bus driver with Atlantic Services Group ("Atlantic") from approximately January 2008 through June or July of 2008. In June of 2008, he was incarcerated for a period of twelve days. Eventually, he applied for unemployment benefits. On December 3, 2008, DOES issued a notice to Mr. Gilmore denying his request for unemployment benefits. DOES disqualified Mr. Gilmore from receiving benefits based on the determination that he was separated from his job with Atlantic "due to 'no call/no show' job abandonment" after he "left [Atlantic] voluntarily without good cause connected with the work." Mr. Gilmore appealed the determination by filing a request for a hearing with OAH.

Three witnesses testified at Mr. Gilmore's February 6, 2009 hearing: (1) Reggie Tillman, Mr. Gilmore's immediate supervisor, (2) Ayanna Howard, Mr. Gilmore's fiancée, and (3) Mr. Gilmore himself. Atlantic was represented by its Human Resources Director Chris Mulden and Mr. Gilmore represented himself. No documents were admitted into evidence. The following facts were elicited at the hearing.

Mr. Tillman was the only witness to testify on behalf of Atlantic. He asserted that Mr. Gilmore had requested time off for an eye injury, was out for that day,[1] and did not return. According to Mr. Tillman, at some point, Atlantic submitted "a job abandonment letter to [Mr. Gilmore]." The employer did not seek to admit the letter into evidence, and the details of the letter were not provided. Mr. Tillman was aware that a friend of Mr. Gilmore, presumably Ms. Howard, informed an Atlantic bus driver that Mr. Gilmore was incarcerated. Mr. Tillman asked the driver to tell Mr. Gilmore's friend to call him so that he could "have it confirmed that [Mr. Gilmore] is incarcerated" and "do what we have to do as far as ... holding his job[.]" According to Mr. Tillman, Mr. Gilmore "was a pretty good worker, and if he would have called like a month later" and requested to have his job back, Mr. Tillman "probably would have g[iven] it to him." However, Mr. Tillman testified that after Mr. Gilmore requested to have time off for his eye injury "he just didn't show up again" and Mr. Gilmore "never heard anything else from him."[2]

1. Mr. Tillman could not remember the exact date on which Mr. Gilmore took off for his eye injury. He first stated that it was "a couple days before" "the lady came over" to speak to him, which presumably meant a couple of days before Ms. Howard came to speak to him. Yet, Mr. Tillman later stated that it was in either July or August of 2008.

2. Contrary to Mr. Tillman's testimony, Mr. Mulden stated in his closing argument that Mr. Tillman "did submit time off and made [Atlantic] aware of the one-day court date"

Atlantic's policy for paid time off ("PTO") was not admitted into evidence. Mr. Tillman testified that drivers requesting time off were required to complete a PTO form and provide about a week's notice or "give [Mr. Gilmore] enough time to cover that route." In emergency situations, however, Mr. Tillman "overlook[ed] the procedures" and gave the driver the day off as long as the route could be covered by another driver Mr. Tillman asserted that if Atlantic did not hear from the driver for "three or four days," that was considered "job abandonment." Yet he also testified that he did not know what the procedure was for job abandonment, but he guessed that it meant that the person was fired. Mr. Tillman's discussion with the Administrative Law Judge ("ALJ") regarding Mr. Gilmore's separation from Atlantic occurred as follows:

Q: What was the cause for [Mr. Gilmore's] separation from employment?

A: Well, we—situations like this, we don't hear from somebody, [for] three or four days, its job abandonment. You know, it wasn't nothing he had done—

Q: So did Employer fire Mr. Gilmore?

A: I don't know what the procedure is for job abandonment. Is that firing him? You know, I guess it is, you know.

Mr. Gilmore testified that he told Mr. Tillman, "at least two weeks" in advance

that he "had a court date coming up on June 24, 2008, and that he wasn't going to be in that day." Immediately after his court hearing, he was incarcerated for twelve days. On Saturday, June 25, 2008,[3] he contacted his fiancée, Ms. Howard, provided her with a phone number, and asked her to "get in contact with Reggie [Tillman]" and "tell him the situation" regarding his incarceration. Mr. Gilmore requested that Ms. Howard ask Mr. Tillman if she could obtain Mr. Gilmore's paychecks for him. Ms. Howard stated that on Monday, June 27, 2008, she initially spoke with an Atlantic employee other than Mr. Tillman and informed that person of Mr. Gilmore's situation. The employee directed her to Mr. Gilmore's supervisor. Ms. Howard testified that, at some point during the week after Mr. Gilmore was incarcerated, she spoke with Mr. Tillman and informed him that Mr. Gilmore "lost [his] court trial and should be back in about two weeks." Ms. Howard asked if she could have Mr. Gilmore's friend and co-worker, Louis Jordan, obtain Mr. Gilmore's checks and send them to her. Mr. Jordan, who knew Ms. Howard from church, obtained two of Mr. Gilmore's checks and brought them to Ms. Howard following church service.[4]

OAH issued its final order on April 8, 2009 affirming DOES's determination on different grounds. The order states that Atlantic "provided sufficient evidence to prove misconduct on the part of [Mr. Gilmore]" as defined in 7 District of Columbia

---

but Mr. Gilmore's time off "extended beyond the amount of ... time he had available[,]" and Atlantic was not made "aware of the [full] situation."

**3.** The dates of the June 2008 calendar do not correspond with the dates and days of the week given in the testimony. June 25, 2008 was a Tuesday. Assuming Mr. Gilmore's court date was on a Friday, and he spoke with Ms. Howard the following Saturday, his court

date likely was on June 20 or 27, 2008 and his conversation with Ms. Howard likely was on June 21 or 28, 2008.

**4.** It is unclear from the record precisely when Ms. Howard received Mr. Gilmore's checks. However, Ms. Howard testified that she did not see Mr. Jordan on the Sunday following Mr. Gilmore's initial phone call notifying her that he was incarcerated.

Municipal Regulations ("DCMR") 312, pursuant to the District of Columbia Unemployment Compensation Act. D.C.Code § 51–110(b). However, the order quotes 7 DCMR §§ 312.3 and 312.4 which concern gross misconduct. Moreover, the ALJ also determined that:

> [t]he evidence establishes that Claimant's conduct, in the form of no call or no show for three consecutive days, constituted "job abandonment" which, as the Court of Appeals noted in *Taylor v. D.C. Dep't of Emp't Servs.*, 741 A.2d 1048, 1049 (D.C.1999), connotes a voluntary decision to quit. An employee's departure from a job is voluntary if the departure is not compelled by the employer. *Cruz v. D.C. Dep't of Emp't Servs.*, 633 A.2d 66, 70 (D.C.1993). Because Claimant voluntarily left his job with Employer with no showing of good cause connected with that employment, Claimant is not eligible for unemployment compensation benefits. *Gomillion v. D.C. Dep't of Emp't Servs.*, 447 A.2d 449, 451 (D.C.1982).

OAH found that, "Ms. Howard did not contact Mr. Tillman" until a week after Mr. Gilmore's incarceration.[5] Mr. Tillman provided Mr. Jordan with Mr. Gilmore's checks to give to Ms. Howard, but "[t]hereafter, neither [Mr. Gilmore] nor anyone on his behalf communicated with [Atlantic] regarding [Mr. Gilmore's] situation." Furthermore, "[b]ecause of [Mr. Gilmore's] absence for three consecutive days without reporting to work or calling, [Atlantic] terminated [him] for job abandonment."

## II.

On appeal, Mr. Gilmore argues that OAH lacked substantial evidence support-ing its determinations that Mr. Gilmore was disqualified from receiving unemployment benefits because (1) he committed misconduct, and (2) he voluntarily quit his job without good cause.

We must affirm the OAH decision if "(1) OAH made findings of fact on each materially contested issue of fact, (2) substantial evidence supports each finding, and (3) OAH's conclusions flow rationally from its findings of fact." *Rodriguez v. Filene's Basement Inc.*, 905 A.2d 177, 180–81 (D.C.2006) (citations omitted). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 181 (internal quotation marks and citation omitted). "Factual findings supported by substantial evidence on the record as a whole are binding on the reviewing court...." *McKinley v. District of Columbia Dep't of Emp't Servs.*, 696 A.2d 1377, 1383 (D.C. 1997) (citation omitted). "'If the agency fails to make a finding on a material, contested issue of fact, this court cannot fill the gap by making its own determination from the record, but must remand the case for findings on that issue.'" *Brown v. Corrections Corp. of America*, 942 A.2d 1122, 1125 (D.C.2008) (quoting *Colton v. District of Columbia Dep't of Emp't Servs.*, 484 A.2d 550, 552 (D.C.1984)). "Whether a fired employee's 'actions constituted misconduct, gross or simple,' is a legal question ... and our review of an agency's legal rulings is '*de novo.*'" *Odeniran v. Hanley Wood, LLC*, 985 A.2d 421, 424 (D.C.2009) (quoting *Washington Times v. District of Columbia Dep't of Emp't Servs.*, 724 A.2d 1212, 1220 (D.C.1999)

---

5. OAH's findings initially state that "Ms. Howard did not contact Mr. Tillman," but later state that "[a] week after Claimant's incarceration, Ms. Howard spoke to Mr. Till-man," and "Mr. Tillman then provided Mr. Jordan with Claimant's checks to give to Ms. Howard."

(other citation omitted)). "An employer seeking to prevent the payment of unemployment compensation bears the burden of proving that the employee engaged in misconduct (gross or otherwise)." *Morris v. United States Envtl. Prot. Agency,* 975 A.2d 176, 181–82 (D.C.2009) (citing 7 DCMR § 312.2) (other citation and footnote omitted).

■ Pursuant to D.C.Code § 51–109, an unemployed individual is presumed to be eligible to receive unemployment benefits so long as the individual meets certain statutory requirements. *Amegashie v. CCA of Tennessee,* 957 A.2d 584, 587 (D.C. 2008). "That presumption is rebutted, and the employee becomes ineligible for benefits, when the employer proves by a preponderance of the evidence that the employee was fired for misconduct." *Morris,* 975 A.2d at 181 (citing D.C.Code § 51–110 (2001)).

■ District of Columbia law distinguishes between "gross misconduct" and "misconduct, other than gross misconduct," which we refer to as "simple misconduct." *Odeniran,* 985 A.2d at 424–25 (quoting D.C.Code § 51–110(b)(1)). Gross misconduct is defined as:

> [A]n act which deliberately or willfully violates the employer's rules, deliberately or willfully threatens or violates the employer's interest, shows a repeated disregard for the employee's obligation to the employer, or disregards standards of behavior which an employer has a right to expect of its employee.

7 DCMR § 312.3. Gross misconduct includes "[r]epeated absence or tardiness following warning." *Id.* "[T]o constitute gross misconduct, an employee's misdeeds must be serious indeed," *Odeniran,* 985 A.2d at 427, and proof of gross misconduct

may require a "heightened showing of seriousness or aggravation, lest the statutory distinction between gross and 'simple' misconduct ... be erased." *Doyle v. NAI Personnel, Inc.,* 991 A.2d 1181, 1183 (D.C. 2010). Simple misconduct, however, encompasses "those acts where the severity, degree, or other mitigating circumstances do not support a finding of gross misconduct." 7 DCMR § 312.5; *see also Odeniran,* 985 A.2d at 425. Simple misconduct is defined as:

> [A]n act or omission by an employee which constitutes a breach of the employee's duties or obligations to the employer, a breach of the employment agreement or contract, or which adversely affects a material employer interest.

7 DCMR § 312.5. Simple misconduct includes "[m]inor violations of employer rules" and "[a]bsence or tardiness where the number of instances or their proximity in time does not rise to the level of gross misconduct." 7 DCMR § 312.6(a), (c). This Court has stated that "[a]ttendance at work is an obligation which every employee owes to his or her employer, and poor attendance, especially after one or more warnings, constitutes misconduct sufficient to justify the denial of a claim for unemployment benefits." *Shepherd v. District of Columbia Dep't of Emp't Servs.,* 514 A.2d 1184, 1186 (D.C.1986) (citation omitted).

### III.

■ There are several problems with OAH's determination that Mr. Gilmore was terminated for misconduct. First, OAH fails to specify which form of misconduct—gross or simple—it concluded Mr. Gilmore engaged in.[6] *See Doyle,* 991 A.2d

---

6. The confusion regarding the form of misconduct Mr. Gilmore allegedly engaged in is

exacerbated by the following: (1) OAH refers to "misconduct" generally throughout its or-

at 1183 (stating that whether the employer's decision was based on gross misconduct is an issue distinct from whether that decision was based on simple misconduct). Second, OAH's order contains no findings on the issues of either gross or simple misconduct. *See Rodriguez*, 905 A.2d at 180 (OAH must make findings of fact on each contested issue of material fact). Third, OAH "must determine whether the particular reason given by the employer [i.e., gross or simple misconduct] was in fact the basis of the employer's decision to fire the employee." *See Hegwood v. Chinatown CVS, Inc.*, 954 A.2d 410, 412 (D.C. 2008) (internal quotation marks omitted) (quoting *Smithsonian Inst. v. District of Columbia Dep't of Emp't Servs.*, 514 A.2d 1191, 1194 (D.C.1986)).[7] Because the findings with respect to the above issues are limited and the conclusions somewhat vague, we are unable to determine whether the misconduct determination "flow[s] rationally from [the] findings of fact." *Rodriguez*, 905 A.2d at 180.[8]

▉▉▉▉ Assuming OAH concludes that Mr. Gilmore engaged in gross misconduct, it must issue findings, supported by substantial evidence, that Mr. Gilmore's conduct was deliberate or willful. *See Amegashie*, 957 A.2d at 588. "To prove that an employee is guilty of gross misconduct, the employer must prove not only that [the employee] was absent without authorization, but also that the absences were willful and deliberate." *Morris*, 975 A.2d at 184. Evidence of repeated absence following repeated warnings may establish a prima facie case of gross misconduct, but "when the employee proffers evidence suggesting that such actions were sufficiently excusable to negate willfulness or deliberateness, the burden shifts back to the employer to disprove such evidence." *Id.* The ultimate burden of proving misconduct is always with the employer. *Id.* Mr. Gilmore explained that he attempted to reach his employer through Ms. Howard. It is uncontested that at some point within a week of Mr. Gilmore's absence from work, Mr. Gilmore's supervisor, Mr. Tillman, spoke with Ms. Howard about delivering Mr. Gilmore's paychecks. There are contested issues of material fact as to whether (1) Mr. Gilmore sought to return to his job, and (2) Ms. Howard indicated as much to Mr. Tillman. Without findings as to these facts, OAH cannot determine whether Mr. Gilmore acted intentionally. *See Bowman–Cook v. Washington Metro. Area Transit Auth.*, 16 A.3d 130, 135 (2011) (stating that the basis for concluding that

---

der; (2) OAH mentions the distinction between gross and simple misconduct in its order, but cites only the definition for gross misconduct; (3) DOES's initial decision was not based on a finding of misconduct, but rather a determination that Mr. Gilmore "left [his job] voluntarily without good cause connected with the work."

7. OAH's order states that the "[e]mployer asserts that it discharged Claimant for misconduct because he abandoned his job." However, the order does not state whether it credits the employer's asserted reason for discharging Mr. Gilmore or finds that the assertion is supported by the record. *See Doyle*, 991 A.2d at 1183 ("Whether an employee was rightly discharged for gross misconduct is ... an issue distinct from whether the employer has a reason to discharge the employee.") (internal quotation marks and citation omitted); *Morris*, 975 A.2d at 182 ("Not every act for which an employee may be dismissed from work will provide a basis for disqualification from unemployment compensation benefits because of misconduct.") (quotation marks and citation omitted).

8. *See 2101 Wisconsin Assocs. v. District of Columbia Dep't of Emp't Servs.*, 586 A.2d 1221, 1224 (D.C.1991) ("It is fundamental that we must know what a decision means before the duty becomes ours to say whether it is right or wrong.") (citation and internal quotation marks omitted).

petitioner committed misconduct was inadequate without findings as to whether petitioner intentionally violated employer's policy or intentionally failed to make a good faith effort to comply with the policy); *see also Chase v. District of Columbia Dep't of Emp't Servs.*, 804 A.2d 1119, 1124 n. 12 (D.C.2002) (stating that even a determination of simple misconduct may require a finding that the misconduct was intentional).

Furthermore, if OAH's determination that Mr. Gilmore engaged in *either* gross or simple misconduct is based on a violation of one of Atlantic's rules, there must be a determination "(a) [t]hat the existence of the employer's rule was known to the employee[;] (b) [t]hat the employer's rule is reasonable; and (c) [t]hat the employer's rule is consistently enforced by the employer." 7 DCMR § 312.7; *see also McCaskill v. District of Columbia Dep't of Emp't Servs.*, 572 A.2d 443, 446 (D.C.1990) ("[F]inding that an employee has violated company policy, by itself, is not enough to sustain a conclusion that the employee was fired for misconduct."). OAH did not issue findings or conclusions as to any of these issues.[9]

 A determination that Mr. Gilmore voluntarily left his job is not supported by substantial evidence. *See* D.C.Code § 51–110(a) (stating that "any individual who left his [or her] most recent work voluntarily without good cause connected with work ... shall not be eligible for benefits"). OAH's order suggests that the em-

ployer met its burden of proving that Mr. Gilmore was discharged for voluntarily leaving his job due to "job abandonment." OAH did not issue findings on this issue. However, Mr. Gilmore testified that his absence from work was due to his incarceration. Atlantic's only witness, Mr. Tillman, testified that he guessed that "job abandonment" meant that the employee had been fired. Atlantic therefore failed to successfully rebut the presumption that Mr. Gilmore's departure was involuntary. *Cruz v. District of Columbia Dep't of Emp't Servs.*, 633 A.2d 66, 69–70 (D.C. 1993) (citing 7 DCMR § 311.2). The evidence does not support a conclusion that Mr. Gilmore's departure "was based on his own volition, and not compelled by the employer." *Id.* at 70. (citation omitted).

Accordingly, for the foregoing reasons, we reverse the decision of OAH and remand for further proceedings not inconsistent with this opinion.

*So ordered.*

---

9. OAH does not identify, and the record does not reveal, "a precise statement of the applicable employer policy" at issue. *Amegashie,* 957 A.2d at 588. Mr. Tillman testified that if Atlantic did not hear from the driver for "three or four days," that was considered "job abandonment." He stated that a job abandonment letter was sent to Mr. Gilmore at some point. However, neither the job abandonment policy nor the job abandonment

letter were admitted into evidence. Mr. Tillman later testified that he did not know what the procedure for job abandonment was.

Mr. Gilmore also explained that employees were required to fill out a PTO form to request time off. However, he conceded that he sometimes "overlook[ed] the procedures" in emergency situations, which suggests that the policy was not consistently enforced.