*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 15-AA-22

UZOCHUKWU J. NWOKWU, PETITIONER,

V.

ALLIED BARTON SECURITY SERVICE, RESPONDENT.

On Petition for Review from the Office of Administrative Hearings
(2014-DOES-1630)

(Submitted March 10, 2016                    Decided October 19, 2017)

*David A. Reiser*, with whom *Jacob Schuman*, and *Jonathan H. Levy*, Legal Aid Society of the District of Columbia, were on the brief for petitioner.

Before BLACKBURNE-RIGSBY[*] and EASTERLY, *Associate Judges*, and REID, *Senior Judge*.

---

[*] Chief Judge Blackburne-Rigsby was an Associate Judge of the court at the time the case was submitted. Her status changed to Chief Judge on March 18, 2017.

EASTERLY, *Associate Judge*: Petitioner Uzochukwu Nwokwu seeks review of a decision by an Office of Administrative Hearings (OAH) Administrative Law Judge (ALJ) determining that Mr. Nwokwu was ineligible for unemployment benefits. The ALJ concluded Mr. Nwokwu had voluntarily quit his job with his employer, Allied Barton Security Services, when he was removed from an assignment at a third party location and failed to timely contact Allied Barton for a new one. The ALJ reasoned that Mr. Nwokwu "had a duty to take steps to preserve his employment," and that he had breached this duty with his inaction.

We reverse. Under our employment benefits statute, which we interpret in favor of awarding benefits in light of its humanitarian purpose, a claimant is presumed to have left his job involuntarily unless the employer proves otherwise. To carry this burden, the employer must present evidence that the former employee affirmatively acted to end the employment relationship, or at least affirmatively acted in such a way that his desire to end the relationship may be reasonably inferred. It is not enough for an employer to show that a claimant precipitated his termination by his failure to do work or make himself available to do work. Rather, it must be apparent that the claimant actually, voluntarily, *quit*. Because Allied Barton did not prove that Mr. Nwokwu voluntarily quit his job—the only theory of ineligibility it pursued before OAH—we reverse and remand the case to

OAH with directions to award the unemployment compensation benefits due to Mr. Nwokwu under the law.

## I. Facts

Mr. Nwokwu was employed by Allied Barton, a security services company. In August 2012, he was assigned to work at a building occupied by the Federal Deposit Insurance Corporation (FDIC). A year later, on August 7, 2013, Allied Barton removed Mr. Nwokwu from that work site after a supervisor reported that he had been sleeping at his post.[1] What happened next is subject to some dispute, not only because Mr. Nwokwu and Allied Barton gave differing accounts, but also because Allied Barton took inconsistent positions in the course of litigating Mr. Nwokwu's claim for unemployment benefits.

Allied Barton's initial position before a Department of Employment Services (DOES) claims examiner was that Mr. Nwokwu was ineligible for benefits because it had "discharged" him from its employ for misconduct after the sleeping incident. But when Mr. Nwokwu challenged the determination denying him benefits on that basis and requested a hearing by an OAH ALJ, Allied Barton provided a different

---

[1] Allied Barton represented that the decision to remove Mr. Nwokwu was pursuant to a mandatory provision of its contract with FDIC.

justification for Mr. Nwokwu's ineligibility: it claimed that, after it notified Mr. Nwokwu that he could no longer work at the FDIC work site, he voluntarily quit by failing to timely contact Allied Barton, as instructed, for a new assignment.[2]

In support of this narrative, Allied Barton presented testimony from one witness, its project manager at the FDIC worksite, Barry Leese. Mr. Leese testified that Mr. Nwokwu "was notified to contact our HR [Human Resources] Department to look for other positions he may be able to fulfill." Mr. Leese did not "personally" communicate this message to Mr. Nwokwu, but he identified a "Disciplinary/Counseling Statement" representing that, after the sleeping incident, Mr. Nwokwu had "been instructed to contact HR/recruiting to determine suitability for placing at another site."[3] The signature line for Mr. Nwokwu on the statement was blank. The statement did not specify a required timeframe for reporting or a point of contact.

---

[2] There was no discussion at the OAH hearing about Allied Barton's change in its theory of the case.

[3] The statement bore a typed "signature" of a "Sgt Broadus," but Mr. Leese indicated that he had written the language stating that Mr. Nwokwu had been instructed to contact HR, and that fact seemed to be the basis of his testimony that Mr. Nwokwu "was notified . . . by me personally[] to contact HR."

In response to an inquiry from the ALJ about whether there was a "deadline where [an employee] is considered [to have] abandoned" his position at Allied Barton, Mr. Leese testified that "[t]he rule of thumb is three days." But the excerpts of its policy manual that Allied Barton put into evidence did not memorialize this "rule of thumb," and Allied Barton presented no evidence that Mr. Nwokwu had notice of this alleged rule.

Regarding the proper point of contact at HR, Mr. Leese testified that Mr. Nwokwu should have called Allied Barton's recruiter, Cory Plummer. Mr. Leese was asked how he, a project supervisor at the FDIC worksite, knew that Mr. Nwokwu had not in fact contacted Mr. Plummer. Mr. Leese indicated that he did not know but only inferred that Mr. Nwokwu had not done so because he never received a notification from HR that Mr. Nwokwu was being transferred to another worksite.

Mr. Leese testified that Allied Barton next heard from Mr. Nwokwu on October 7, 2013 when Mr. Nwokwu called Amanda Gaudard in Allied Barton's HR department. Mr. Leese read into the record an email Ms. Gaudard had sent Mr. Leese memorializing the call and asking him to advise her about Mr. Nwokwu's status:

> Mr. Nwokwu called this afternoon inquiring about returning to work from leave. However, he is active in the system with no absences entered for FMLA or leave. He stated he was out for 2 months taking care of business for a relative in another country. Can you please advise on the status of Mr. Nwokwu?

The record is silent as to how Mr. Leese responded to Ms. Gaudard's inquiry.

Mr. Leese acknowledged that the date of submission on the Termination Change of Status form regarding Mr. Nwokwu's termination of employment with Allied Barton was January 23, 2014, more than three months after this email exchange.[4] The form indicates that the reason for Mr. Nwokwu's "resignation" was "job abandonment (EE Failed to maintain contact)" and contains a brief statement in the comment section that "Officer Nwokwu was removed from this contract for sleeping and sent to ABSS Corporate for disposition. No indication Officer Nwokwu followed up with Corporate appointment." Mr. Leese acknowledged that there was no specific reference in the Change of Status form to Mr. Nwokwu's failure to contact Allied Barton between August 7 and October 7,

---

[4] Mr. Leese testified that he had to send a "separation report" to HR to trigger the issuance of the Change of Status form and that, in Mr. Nwokwu's case, he had sent more than one email, but he did not testify as to when he had initially contacted HR. And later, he indicated that if an employee fails to make contact with Allied Barton within the requisite three days, the employee's removal should be "immediate."

2013. Allied Barton presented no evidence that it ever sent this or any other document to Mr. Nwokwu informing him that his employment with Allied Barton had been terminated.[5]

After Allied Barton presented its case, Mr. Nwokwu testified and gave a different account of the conclusion of his employment relationship with Allied Barton. He testified that on August 7, 2013, he received a call directing him not to report to the FDIC[6] and to "go to the office and be given another [work]site." He did this on or about August 10. But when he went to the office, "nobody at HR knew anything about [his] case." When Mr. Nwokwu tried to press for more information, the individual to whom he was speaking "got angry and pushed [him] out of the – told me to go out." Mr. Nwokwu testified he was "scared of going back to that office because of the way I was treated that day."

---

[5] The form also has lines to indicate who submitted it to HR, when HR received it, and when termination was approved. These lines are all blank.

[6] Mr. Nwokwu stated that he was not given a reason for his reassignment. He denied meeting with Sergeant Broadus about the sleeping incident, and he denied receiving a copy of the Disciplinary/Counseling Statement.

Thereafter Mr. Nwokwu testified that he made multiple phone calls to HR.[7] At some point he was given the name of a woman to talk to, Lisa McClaren, but he was never able to get through to her. Mr. Nwokwu also spoke to Mr. Plummer, asking him for "another [work] site." Mr. Nwokwu testified that he eventually returned in person to the HR office and spoke to Ms. Gaudard.[8]

Mr. Nwokwu testified that he continued to request reassignment with Allied Barton,[9] and, eventually, in December 2013, Mr. Plummer put him in contact with another colleague, who assigned Mr. Nwokwu to work at the Youth Services Center in Northeast D.C. Mr. Nwokwu proffered as an exhibit a record of his payment by Allied Barton from that assignment, which lasted two weeks. And he testified that at no point between August and December 2013 had anyone informed him that his "removal had been proposed for job abandonment."

---

[7] Mr. Nwokwu acknowledged that he did not contact his supervisor at FDIC, Mr. Leese to ask him for an explanation or assistance; he indicated that he did not think his site supervisor could help him obtain a new assignment at a different site.

[8] Mr. Nwokwu denied telling Ms. Gaudard that he had been out of the country.

[9] Mr. Nwokwu testified he called two or three times a week and also sent emails, but he had no records of his calls, and the first emails in the record were dated November 7, 2013.

After the December assignment ended, Mr. Nwokwu testified he remained in contact with Allied Barton, working with them to take the necessary steps (e.g., drug testing, training) to renew his Special Police Officer's (SPO) license. He presented emails documenting these efforts which both pre and post-dated the January 2014 Change of Status form supposedly documenting his termination. In February 2014 he corresponded with Mr. Plummer about various trainings and about getting employment verification so that he could renew his family's health care. Mr. Nwokwu also testified that he continued to request a new work assignment. During this time, no one at Allied Barton ever told him that his employment had been terminated. The first notice he received was from his health insurance provider, in June 2014. He testified that he never got back his renewed SPO license from Allied Barton and that he still had his Allied Barton uniforms.

After the hearing, the ALJ issued a final order, including one page of "Findings of Fact" and two pages of "Discussion and Conclusions of Law." In his findings of fact, the ALJ focused almost exclusively on the events between August 5, 2013 and October 7, 2013. The ALJ found that as a result of the sleeping incident, and per FDIC policy, Mr. Nwokwu had been removed from the FDIC worksite on August 7, 2013, and "informed" he should "contact human resources if he wanted another work assignment." Although the ALJ credited Mr. Nwokwu's

testimony that he had gone to HR a few days later, the ALJ also found that Mr. Nwokwu "got into a physical altercation with a human resources employee" and "was physically removed from the building." The ALJ then found that, "two months after his last day at FDIC," Mr. Nwokwu "telephoned Human Resources Coordinator Amanda Gaudard to request another assignment."[10] The only other finding the ALJ made was that Mr. Nwokwu had worked for Allied Barton at the Youth Services Center in Northeast D.C. in December 2013, which the ALJ characterized as a "temporary position."

Based on these findings, the ALJ affirmed the denial of benefits to Mr. Nwokwu. The ALJ acknowledged that an "employee's leaving work is presumed to be involuntary" and that the employer bears the burden to prove that an employee has left voluntarily. But the ALJ then determined that Allied Barton had satisfied this burden because Mr. Nwokwu has a "duty to take steps to preserve his employment. *Freeman v. District of Columbia Dep't of Emp't Servs.*, 568 A.2d 1091, 1093 (D.C. 1990) (an employee has 'an obligation to preserve his

---

[10] The ALJ explained in his "Discussion and Conclusions of Law" that he did not credit Mr. Nwokwu's testimony that, between August and October, he had "both emailed and telephoned Employer seeking reassignment to a new worksite."

employment relationship.')." The ALJ "conclude[d] that a reasonable and prudent person in the job market would have contacted Employer immediately after being removed from the FDIC worksite—not waited two months." (The ALJ did not "consider [Mr. Nwokwu's] single attempt to visit [HR] as a reasonable effort to preserve his employment because he got into a physical altercation with a member of the [HR] office and was escorted out of the building.") Accordingly, the ALJ determined that Mr. Nwokwu "voluntarily left his job when he failed to contact [Allied Barton's] human resources for two months for another assignment after he was removed from the FDIC contract." Because Mr. Nwokwu did not have good cause for this voluntary quit,[11] the ALJ "affirmed"—albeit on different grounds— the DOES claims examiner's finding that Mr. Nwokwu was disqualified from receiving unemployment benefits.

## II. Analysis

Before this court, Mr. Nwokwu challenges the ALJ's decision denying him benefits on two grounds. Mr. Nwokwu first argues that the ALJ erred when he

---

[11] *See* D.C. Code § 51-110 (a) (2013 Repl.); 7 DCMR § 311 (2014).

determined that Mr. Nwokwu voluntarily quit his job with Allied Barton because he was not in contact with HR for two months after he was removed from his work assignment at the FDIC. Specifically, Mr. Nwokwu argues that the ALJ was wrong to permit Allied Barton to prevail on a showing that he had failed to fulfill his "duty to take steps to preserve his employment"; rather, it was Allied Barton's burden to show that he voluntarily changed his employment status. Mr. Nwokwu also argues that the ALJ erred in concluding that he voluntarily quit his job with Allied Barton in light of the evidence in the record that he worked, was paid, and was treated as an employee after the time period in which Allied Barton asserted he had abandoned his job. Whether an employee "voluntarily quits" his job is a legal question that we review de novo. *Washington Chapter of the Am. Inst. of Architects v. District of Columbia Dep't of Emp't Servs.*, 594 A.2d 83, 86–87 (D.C. 1991) (explaining that whether someone has quit voluntarily or not "has a legal consequence . . . . Thus, that determination dictates a conclusion of law, not merely a finding of fact."); *Odeniran v. Hanley Wood, LLC*, 985 A.2d 421, 424 (D.C. 2009) (this court reviews agency legal rulings de novo).[12]

---

[12] Although we defer to an agency's reasonable interpretation of an ambiguous statute, we have no agency interpretation before us in this case because Allied Barton did not present its voluntary quit theory to the DOES claims examiner. Instead it first presented this theory to OAH, "an all-purpose adjudicatory body," whose views do "not command deference." *United Dominion*

(continued…)

"The purpose of the District's unemployment compensation statute [D.C. Code § 51-101 to 127] is to protect employees against economic dependency caused by temporary unemployment and to reduce the need for other welfare programs." *Cruz v. District of Columbia Dep't of Emp't Servs.*, 633 A.2d 66, 69 (D.C. 1993). As we have noted in countless decisions, given its remedial, humanitarian goals the statute's "benefits sections must be liberally and broadly construed." *Id.*; *see also Caison v. Project Support Servs., Inc.*, 99 A.3d 243, 249 (D.C. 2014); *Imperial Valet Servs., Inc. v. Alvarado*, 72 A.3d 165, 166 (D.C. 2013); *Bowman-Cook v. Washington Metro. Area Transit Auth.*, 16 A.3d 130, 134 (D.C. 2011); *District of Columbia Dep't of Mental Health v. Hayes*, 6 A.3d 255, 260 (D.C. 2010). By the same token, its limitations on benefits must be strictly and narrowly construed.

An employee may be ineligible for unemployment benefits if he "left his most recent work voluntarily without good cause connected with the work." D.C. Code § 51-110 (a); *see also* 7 DCMR § 311.1. A claimant-employee is presumed

---

(…continued)
*Mgmt. Co. v. District of Columbia Rental Hous. Comm'n*, 101 A.3d 426, 430 (D.C. 2014).

to have left work *in*voluntarily "unless the claimant acknowledges that the leaving was voluntary or the employer presents evidence sufficient to support a finding . . . that the leaving was voluntary." 7 DCMR § 311.2–.3; *see Berkley v. D.C. Transit, Inc.*, 950 A.2d 749, 757 (D.C. 2008) (explaining that "an employee's departure is presumed to be involuntary unless the employer fulfills its burden of proving the employee left voluntarily" and that "[s]ubstantial policy considerations underlie the presumption of involuntariness."). The regulations specify that voluntariness in this context is to be given its "ordinary meaning," 7 DCMR § 311.2, but no definition or guidance is provided for interpreting what constitutes the act of "leaving" a job.

We have consistently required an employer to show that the employee affirmatively acted to end the employment relationship—e.g., by submitting his resignation[13]—or at least affirmatively acted in a such way that the desire to end the employment relationship could be inferred—e.g., by taking a full-time job with

---

[13] *See, e.g.*, *Coalition for the Homeless v. District of Columbia Dep't of Emp't Servs.*, 653 A.2d 374, 378 (D.C. 1995) (voluntary quit where employee orally resigned); *Freeman*, 568 A.2d at 1092 (voluntary quit where employee "changed her status from full-time banquet server to on-call banquet server" thereby "relinquish[ing] her entitlement to certain benefits of a full-time employee."); *cf. Washington Chapter of Am. Inst. of Architects*, 594 A.2d at 87 (no voluntary quit where employee signed a letter of resignation under duress).

a competitor.[14] But we have distinguished and deemed inadequate to support a voluntary quit determination evidence that an employee failed to perform his job responsibilities. Thus in *Taylor v. District of Columbia Dep't of Emp't Servs.*, 741 A.2d 1048 (D.C. 1999), we rejected the employer's argument that an employee who refused orders and left the worksite without fulfilling her obligations had "constructively" voluntarily quit. *Id.* at 1049. We explained that, in cases where abandonment of job responsibilities was the proffered factual foundation for the employee's inability for unemployment benefits, such behavior is analyzed under the rubric of employee misconduct.[15] *Id.* More recently, in *Doyle v. NAI Pers. Inc.*, 991 A.2d 1181 (D.C. 2010), we expressed skepticism that a staffing agency employee's mere failure to notify her employer when a temporary placement ended was, by itself, a sufficient affirmative, voluntary act to indicate that the employee had voluntarily quit. *Id.* at 1184–85. Ultimately, we declined to decide the issue

---

[14] *See, e.g.*, *Pyne v. Mb Staffing Servs., LLC*, 39 A.3d 1258, 1260–61 (D.C. 2012) (voluntary quit where a staffing agency employee who was told she was going to be reassigned to a different worksite registered with different agency in order to remain employed full-time at same location).

[15] *See, e.g.*, *Scott v. Behavioral Research Assocs.*, 43 A.3d 925, 931 (D.C. 2012); *Gilmore v. Atl. Servs. Grp.*, 17 A.3d 558, 565 (D.C. 2011); *Hickey v. Bomers*, 28 A.3d 1119, 1127-28 (D.C. 2011); *Morris v. U.S. Envtl. Prot. Agency*, 975 A.2d 176, 184 (D.C. 2009); *Butler v. District of Columbia Dep't of Emp't Servs.*, 598 A.2d 733, 734-35 (D.C. 1991); *Jones v. District of Columbia Unemployment Comp. Bd.*, 395 A.2d 392, 397 (D.C. 1978); *Hawkins v. District Unemployment Comp. Bd.*, 381 A.2d 619, 622 (D.C. 1977).

"given the ALJ's failure to rule more than hypothetically . . . and the lack of clarity of the record bearing on it."[16] *Id*. at 1184.

We now hold that a mere suspension of contact between an employee and employer, without more, does not support a determination under D.C. Code § 51-110 (a) that a claimant "voluntarily quit" his job and is thus ineligible for unemployment benefits. That the employee works for a staffing agency like Allied Barton does not change the calculus; indeed, where the employee may be outsourced to third-party work sites, it is all the more important for the employer to prove that the employee has voluntarily terminated the employment relationship, not simply that he has concluded or abandoned a particular assignment.

This does not mean that employers may not discharge employees who fail to show up for work or to maintain contact—only that they may not render these employees ineligible for unemployment benefits by labeling this conduct a voluntary quit.  Nor does it mean that employers may not attempt to assert other

---

[16] Notably, the employer in *Doyle* had presented evidence of a written Code of Professionalism "requiring assigned employees to notify it as soon as their temporary placements ended."  991 A.2d at 1182.  No such evidence was presented in this case.  See *infra* note 17.

grounds, such as simple or gross misconduct, for denial of benefits when an employee fails to maintain contact with his employer. See *supra* note 15. But no such attempt has been made here.[17]

Our decision in *Freeman*, is no impediment to this holding. The ALJ interpreted *Freeman* to allow employers to prove that an employee voluntarily quit if the employee breached the "duty to take steps to preserve his employment." In *Freeman,* this court cited a Pennsylvania intermediate appellate court decision, interpreting that state's unemployment compensation laws, for the proposition that "an employee who fails to take all necessary and reasonable steps to preserve her employment will be deemed to have brought about a voluntary termination of employment." 568 A.2d at 1093. The holding in *Freeman*, however, rests on the narrower proposition that "an employee's voluntary change in his or her status

---

[17] Allied Barton, after initially prevailing on a theory of misconduct before a DOES claims examiner abandoned that theory before the OAH ALJ. Moreover, Allied Barton did not present sufficient evidence at the OAH hearing to establish a rule violation constituting misconduct in this case. Although Mr. Nwokwu's site supervisor Mr. Leese testified that Allied Barton had a "rule of thumb" requiring employees to check in with human resources within three days of the end of an assignment, Allied Barton presented no evidence that any such policy had been distributed to employees nor that Mr. Nwokwu had been told that such a policy existed or applied to him. *See Gilmore*, 17 A.3d at 565 (misconduct based on rule violation requires determination that rule was known to employee, rule was reasonable, and consistently enforced).

with the knowledge that the action will result in a lay-off is a voluntary termination." *Id*. Thus we concluded that there was "sufficient evidence to support the agency's finding that petitioner voluntarily and without 'good cause'" quit where she "changed her status from full time banquet server to 'on call' banquet server . . . . in order to follow other pursuits, including school and other employment." *Id*. By changing her status, i.e., affirmatively acting to alter her employment relationship, the employee "set into motion the process which caused her unemployment and failed to take reasonable actions necessary to preserve her employment." *Id*.; *see also id*. at 1094 (concluding that "by changing her status to on-call employment petitioner had maximized the possibility that she would not have work[, and,] [i]n that sense, the agency could find that petitioner had not taken all reasonable steps to preserve her employment."). Our cases interpreting *Freeman* likewise reflect an understanding that we have not dispensed with the requirement that an employer prove that an employee affirmatively acted to terminate his employment relationship in order to render them ineligible for unemployment benefits under a voluntary quit theory. *See Doyle*, 991 A.2d at 1184 (noting that a staffing agency employee's failure to notify her employer of the cessation of her temporary assignment did not appear to be a voluntary quit and "scarcely resemble[d] the conduct [at issue in *Freeman*] of an employee who voluntarily removed herself from the benefits of full-time status"); *Taylor*, 741

A.2d at 1049 n.2 (rejecting the argument that the employee had "constructively" voluntarily quit and distinguishing *Freeman* because "[t]here[,] the employee made a voluntary decision in fact to change her work status").

Applying this "voluntary quit" standard, we conclude that neither the ALJ's findings nor the record as a whole support a determination that Mr. Nwokwu voluntarily left his job with Allied Barton.

The ALJ ignored much of the evidence presented[18] and found only that Allied Barton removed Mr. Nwokwu (involuntarily, per FDIC policy) from the FDIC worksite; that it told him to report to HR and he did so, but got into a fight;[19] and that thereafter he did not contact HR again until he called in October. These findings do not support a determination that Mr. Nwokwu voluntarily quit his job with Allied Barton.

---

[18] *See Berkley*, 950 A.2d at 760–61 (expressing doubt that "substantial evidence supports the ALJ's findings and conclusion" that claimant voluntarily quit, "given the lack of findings regarding significant parts of [claimant's] testimony"); D.C. Code § 2-510 (granting this court the power to set aside findings "[u]nsupported by substantial evidence in the record").

[19] Nothing in the record supports the finding that Mr. Nwokwu got in a fight. Mr. Nwokwu testified that physical aggression was directed at him; he gave no indication that he fought back.

We decline however to remand this case to the ALJ to make additional findings. A remand would be futile, because examining the record as a whole, we see no evidence that would permit a reasonable fact-finder to conclude that Mr. Nwokwu voluntarily quit his job between August and October 2013.[20] *See Badawi v. Hawk One Sec., Inc.*, 21 A.3d 607, 614 (D.C. 2011) (acknowledging that although this court generally may not fill the gap to make findings of fact, this court will not remand if the evidence dictates a result as a matter of law). As noted above, the ALJ credited Mr. Nwokwu's testimony that he did attempt to report to HR on or about August 9, 2013. Thereafter, the credited evidence establishes that he called Ms. Gaudard in HR on October 7, 2013, and told her he "was returning to work from leave."[21] At that point Mr. Nwokwu was still "active in [Allied Barton's] system," and Ms. Gaudard asked Mr. Leese to "advise [her] on the status

---

[20] We are even less inclined to consider remand in light of Allied Barton's shifting explanations for how Mr. Nwokwu came to be unemployed. Allied Barton initially persuaded a DOES claims examiner to deny Mr. Nwokwu benefits on the ground that he had been *involuntarily* discharged for misconduct, but it then argued before the OAH ALJ that Mr. Nwokwu had *voluntarily* quit. *See New Hampshire v. Maine*, 532 U.S. 742, 748 (2001) ("'judicial estoppel' generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.").

[21] The ALJ credited Mr. Nwokwu's representation that he had not left the country but understood him to have taken time off to "assist[] a relative who either resided or travelled in another country with a business matter."

of Mr. Nwokwu." It was uncontested that after his call to Ms. Gaudard, Mr. Nwokwu maintained contact with Allied Barton, as reflected by his emails requesting a new assignment. It is also uncontested that Allied Barton in fact placed Mr. Nwokwu in a new position (albeit only for two weeks) in December 2013. Mr. Leese testified that he did not submit the (unapproved) Termination Change of Status form that Allied Barton put into evidence until January 2014. That form made no mention of a voluntary, affirmative act by Mr. Nwokwu to terminate his employment relationship between August and October; instead it stated only that there was "[n]o indication that Officer Nwokwu followed up with corporate appointment." Finally, even after January 2014, Mr. Nwokwu corresponded with individuals at HR who continued to treat Mr. Nwokwu as an employee, assisting him with efforts to renew his SPO license.

Accordingly, because Allied Barton did not prove that Mr. Nwokwu voluntarily quit his job, we reverse the ALJ's denial of Mr. Nwokwu's claim for unemployment benefits and remand the case to OAH with directions to award the compensation due to Mr. Nwokwu under the law.

*So ordered.*